EXHIBIT E

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

JERRY REYNOLDS,

        Plaintiff,

    v.

DAVE BARRETT, et al.,
        Defendants.

KHALIB (KAY) GOULD,

        Plaintiff,

    v.

DAVE BARRETT, et al.,
        Defendants.

ANTHONY MACK,

        Plaintiff,

    v.

DAVE BARRETT, et al.,
        Defendants.

JOSEPH PONDER,

        Plaintiff,

    v.

TERRY CHAMBERLIN, et al.,

        Defendants.

FILED

01 NOV 15 PM 12:58

U.S. DISTRICT COURT
ORDER  WDNY ROCHESTER
99-CV-6228L

ORDER
99-CV-6503L

ORDER
00-CV-6436L

ORDER
00-CV-6440

ATTEST: A TRUE COPY
U.S. DISTRICT COURT, WDNY
RODNEY C. EARLY, CLERK

By _____
    Deputy Clerk

Original Filed  11/15/01

#44

## Preliminary Statement

Plaintiffs have filed motions to amend their complaints and to consolidate the four above-captioned actions.  Defendants oppose the motions.  Oral argument was heard on November 15, 2001.  By Order of Chief Judge David Larimer, dated June 19, 2000, all pretrial motions have been referred to the undersigned pursuant to 28 U.S.C. § 636 (b)(1)(A)-(B).

## Factual Background

Plaintiffs Reynolds, Gould, Mack and Ponder were all inmate employees of the print shop at the Elmira Correctional Facility. In separately filed complaints, each claim that they were wrongfully discriminated against on the basis of their race.  Defendants either worked in the print shop or were responsible for overseeing the print shop.  Plaintiffs, through recently appointed pro bono counsel, now seek to consolidate the actions and file an amended complaint, arguing that each of their lawsuits contain common questions of law and fact which make the four actions amenable for consolidation.

While recognizing that leave to amend should be freely given, see Foman v. Davis, 371 U.S. 178 (1962), defendants first note that plaintiffs' complaint does not even meet the liberal pleading standards of the Federal Rules of Civil Procedure and thus, defendants argue that plaintiffs' motion should be denied on this

2

ground alone.    Defendants contend that an argument on the appropriateness of consolidation is premature until plaintiffs can at least provide defendants with an acceptable and workable complaint.  Defendants main problem with the proposed complaint is that it neglects to identify the specific factual bases upon which each plaintiff brings his claims against each defendant.

The Court agrees with the defendants.  A complaint alleging a civil rights violation under Section 1983 must contain specific allegations of fact that demonstrate a deprivation of constitutional rights, or it will be dismissed.  <u>Alfaro Motors, Inc. v. Ward</u>, 814 F.2d 883, 887 (2d Cir. 1987).  <u>See also</u> <u>Sonds v. St. Barnabas Hosp. Correctional Health Servs.</u>, 151 F. Supp.2d 303, 308 (S.D.N.Y. 2001) ("Broad and conclusory statements, coupled with a failure to allege the facts of the alleged offending conduct, are insufficient to state a claim"); <u>Pena v. Recore</u>, 2001 WL 262986 at *5 (E.D.N.Y. March 14, 2001) ("The Second Circuit has repeatedly held that 'complaints relying on the civil rights statute are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning'") (citations omitted); <u>Alsaifullah v. Travis</u>, 160 F. Supp.2d 417, 420 (E.D.N.Y. 2001) (dismissing plaintiff's complaint where plaintiff failed to plead with any specificity that defendant discriminated against him); <u>Thomas v. New York City Health & Hosp. Corp.</u>, 2001 WL 1218398 at *4

(S.D.N.Y. October 9, 2001) ("To survive a motion to dismiss, a plaintiff must make specific allegations of fact indicating a deprivation of his or her protected rights.").

Furthermore, "it is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983.'" <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted); <u>Gill v. Mooney</u>, 824 F.2d 192, 196 (2d Cir.1987). A plaintiff may not merely conclusively state that a defendant was involved without some underlying factual support. Indeed, the Second Circuit has held that "a complaint of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone." <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996) (<u>quoting</u> <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983)). <u>See also</u> <u>Gill v. Mooney</u>, 824 F.2d 192, 194-195 (2d Cir. 1987) (Second Circuit requires higher level of detail in pleadings on retaliation claims).

The proposed amended complaint here fails to sufficiently meet the pleading requirements for §1983 actions set forth above. The amended complaint alleges in conclusory form that "the defendants" were each personally involved in the constitutional violations claimed, but fails to provide any factual detail to differentiate the actions of individual defendants. The proposed amended complaint does not offer any detail as to how or when each defendant was involved in the alleged discrimination, either as a

4

direct participant or as a supervisor of a direct participant. <u>See</u> <u>Marable v. Kurtz</u>, 2000 WL 1279763 at *4 (S.D.N.Y. September 11, 2000)("where a complaint is silent as to the nature of a defendant's personal involvement, dismissal of the §1983 claim as to that defendant is proper").

To be sure, plaintiffs are not required to plead each and every detail of the factual bases for their claims.  Such particulars are best left to the discovery process.  However, at the very least, plaintiff must put each defendant on notice as to the specific conduct that he or she is charged with as well as the time and dates of such conduct now known, so as to permit the defendants to reasonably and properly defend themselves.  <u>See</u> <u>Bass</u> <u>v. Jackson</u>, 790 F.2d 260, 263 (2d Cir. 1986) (plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered").

For these reasons, plaintiffs are directed to re-file and personally serve on defense counsel an Amended Complaint by **December 17, 2001** which provides more detail as to the nature of each plaintiff's claims against each individual defendant.  Within five business days thereafter,  defense counsel shall notify the Court whether defendants object to consolidation of these actions[1].

---

[1] Even if the parties are unable to agree on full consolidation of these actions the Court encourages counsel to agree to consolidate them for purposes of discovery and pretrial scheduling, leaving the issue of full consolidation for a later determination of the trial judge.

If defendants continue to oppose consolidation, papers in opposition must be filed and personally served on defense counsel or before **January 11, 2002**. Plaintiffs shall respond to defendants papers on or before **January 22, 2002**. The Court will then rule on the consolidation motion and set the cases down for a Scheduling conference. Should defendants <u>not</u> oppose consolidation, this Court will schedule an earlier scheduling conference.

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     November 15, 2001
           Rochester, New York

# EXHIBIT F

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JERRY REYNOLDS,

00-CV-6400

Plaintiff,

- against -

DAVE L. BARRETT, Industrial Superintendent of Elmira
Correctional Facility; FLOYD BENNETT, Superintendent of
Elmira Correctional And Reception Center; LARRY
POCCOBELLO, Assistant Industrial Superintendent of Elmira;
JACK RATHBUN, General Foreman of Elmira Print Industry;
TERRY CHAMBERLIN, Industrial Training Supervisor of
Elmira Print Industry; GEORGE SARNO, Industrial Training
Supervisor of Elmira Print Industry; JANET KENT, Industrial
Training Supervisor of Elmira Print Industry; DANA SMITH,
Deputy Superintendent of Elmira; JAMES P. THOMPSON,
Senior Correction Counselor of Elmira; JOHN CONROY,
Director of Correctional Industry, Individually and in Their
Official Capacities,

STIPULATION TO
CONSOLIDATE
ACTIONS FOR
PURPOSES OF
DISCOVERY

Civil Action No.
99-CV-06228

Defendants.

KHALIB (KAY) GOULD,

Plaintiff,

- vs. -

DAVE BARRETT, INDUSTRY SUPERINTENDENT, LARRY
POCOBELLO, INDUSTRY ASSISTANT
SUPERINTENDENT, JACK RATHBIN, INDUSTRY
FOREMAN, TERRY CHAMBERLIN, INDUSTRY TRAINING
SUPERVISOR, JANICE KENT, INDUSTRY TRAINING
SUPERVISOR, FLOYD BENNETT, ELMIRA
CORRECTIONAL FACILITY'S SUPERINTENDENT,

Civil Action No.
99-CV-6503

Defendants.

#41

- 2 -

ANTHONY MACK,

                                        Plaintiff,

            vs.

DAVID BARRETT, Industry Superintendent at Elmira
Correctional & Reception Center; LARRY POCOBELLO,
Industry Training Assistant Superintendent at Elmira; TERRY
CHAMBERLIN, Industry Training Supervisor at Elmira; JACK
RATHBURN, Industrial Foreman at Elmira; JOHN CONROY,
Director of Correctional Industries for DOCS; GEORGE
SARNO, Industrial Training Supervisor in Elmira Print Shop;
FLOYD BENNETT, Superintendent at Elmira; DANA
SMITH, Deputy Superintendent of Programs at Elmira        ;
JIM THOMPSON, Program Committee Chairman at Elmira;
JOHNNY BLACK, CorCraft Representative for DOCS Central
Office,

                                        Defendants.

Civil Action No.
00-CV-6436

JOSEPH PONDER,

                                        Plaintiff,

            - against -

TERRY CHAMBERLIN, ELMIRA PRINT SHOP
        INDUSTRIAL TRAINING SUPERVISOR

GEORGE SARNO, ELMIRA PRINT SHOP INDUSTRIAL
        TRAINING SUPERVISOR

JACK RATHBUN, ELMIRA PRINT SHOP INDUSTRIAL
        TRAINING SUPERVISOR

                                        Defendants.

Civil Action No.
00-CV-6440

    IT IS HEREBY STIPULATED AND AGREED by the undersigned parties that the

four above referenced actions be consolidated for purposes of conducting discovery.

- 3 -

The parties further agree no adverse inferences shall be drawn and neither side shall be prejudiced in any way because either (i) the defendants stipulate to proceed with discovery on a consolidated basis, or (ii) plaintiffs agree to amend the complaints after discovery has been completed.

Dated:  December 17, 2001

DOLIN, THOMAS & SOLOMON LLP

By: _____
Christian D. Hancey, Esq.
*Attorneys for Plaintiffs*
135 Corporate Woods, Suite 130
Rochester, New York 14623
Telephone:  (585) 272-0540

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

By: _____
Kelly A. McCarthy
*Attorneys for Defendants*
144 Exchange Blvd.
Rochester, NY 14614
Telephone:  (716) 546-7430

SO ORDERED:

_____
Honorable Jonathan W. Feldman

S:\Shared\Thomas&Solomon\Print Shop\stipulation to consolidate actions for discovery purposes.DOC

EXHIBIT G

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KHALIB GOULD, ANTHONY MACK,
JOSEPH PONDER, and JERRY REYNOLDS
*on behalf of themselves and all others similarly situated,*

                                      *Plaintiffs,*

              - vs -

TERRY CHAMBERLAIN, DAVID L. BARRETT,
FLOYD G. BENNETT, Jr., JOHN CONROY,
JANICE A. KENT, LARRY POCOBELLO,
J. JACK RATHBUN, GEORGE SARNO,
DANA M. SMITH, JAMES P. THOMPSON,

                                        *Defendants.*

**AMENDED
CLASS ACTION
COMPLAINT**

Plaintiffs, Khalib Gould, Anthony Mack, Joseph Ponder and Jerry Reynolds, on behalf of themselves and all others similarly situated, as and for their complaint against defendants, allege the following:

### COMPLAINT - NATURE OF CLAIM

1.      This is a class action proceeding for declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiffs, Khalib Gould, Anthony Mack, Joseph Ponder and Jerry Reynolds, and all others similarly situated by 42 U.S.C. § 1981 ("§ 1981"), as amended; 42 U.S.C. § 1983 ("§ 1983"), as amended; 42 U.S.C. § 1985 ("§ 1985"), as amended; 42 U.S.C. § 1986 ("§ 1986"), as amended; the New York State Human Rights Law ("HRL"); orders and injunctions issued by the United States District Court for the Western District Court of New York; the New York State Constitution; and § 8601 of the CPLR.

## CLASS ACTION ALLEGATIONS

2.     The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b).

3.     The class size is believed to be over 50 members.

4.     The named plaintiffs will adequately represent the interests of the class members because they are similarly situated to the class members and their claims are typical of, and concurrent to, the claims of the other class members.

5.     There are no known conflicts of interest between the named plaintiffs and the other class members.

6.     The class counsel, Dolin, Thomas & Solomon LLP, is qualified and able to litigate the class members' claims.

7.     The class counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under federal and state laws.

8.     Class counsel has handled a significant number of *pro bono* prisoner litigation matters on appointment from the District Court of the Western District of New York.

9.     Common questions of law and fact predominate in this action because the claims of all class members arise from the common policies and/or practices within the Elmira Correctional Facility Print Shop.

10.    The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b) because the prosecution of separate actions by individual members of the class would create a risk of inconsistent and varying adjudications, and the defendants have acted and failed to act on grounds generally applicable to the class; the plaintiffs seek injunctive relief;

- 2 -

and common questions of law and fact predominate among the class members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

11.     The claims of the named plaintiffs are common and typical of the class members.

## JURISDICTION AND VENUE

12.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; and under the Declaratory Judgment Statute, 28 U.S.C. § 2201.

13.     This Court's pendent jurisdiction of claims arising under state law is also invoked.

14.     Venue is appropriate in the Western District of New York since the allegations arose in this district.

## PARTIES

### Named Plaintiffs

15.     Plaintiff, Khalib Gould, was incarcerated at the Elmira Correctional Facility ("ECF" or "Elmira") from June 1993 to the present and was employed in the ECF Print Shop ("Print Shop") from January 10, 1994 to until his termination on or about March 4, 1999.

16.     Plaintiff, Anthony Mack, was incarcerated at ECF and was employed in the ECF Print Shop from December 3, 1998 to on or about April 6, 1999.

17.     Plaintiff, Joseph Ponder, was incarcerated at ECF and was employed in the ECF Print Shop from July 1997 to on or about March 15, 1999.

- 3 -

18.     Plaintiff, Jerry Reynolds, was incarcerated at ECF and worked in the ECF Print Shop from August 1, 1994 to on or about September 10, 1999.

19.     All of the plaintiffs are non-Caucasian individuals.

***Class Members***

20.     The class of putative plaintiffs includes all non-Caucasian inmates at ECF who were employed in the Print Shop from 1994 to the present, as well as all non-Caucasian inmates at ECF who were deterred from working within the Print Shop because of the discriminatory policies and/or practices set forth in this complaint.

***Defendant Chamberlain***

21.     Defendant Chamberlain was employed by the State of New York as an Industrial Training Supervisor ("ITS") from 1989 to 2002, and then was employed as a Production Control Supervisor ("PCS") from 2002 to the present.

22.     As an ITS and PCS, defendant Chamberlain: supervised, hired, promoted, demoted, terminated and disciplined inmates within the Print Shop.

23.     As an ITS and PCS, defendant Chamberlain: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

24.     As an ITS and PCS, defendant Chamberlain received complaints concerning improper treatment of inmates in the Print Shop.

25.     As an ITS and PCS, defendant Chamberlain became aware of improper treatment of inmates in the Print Shop.

- 4 -

26.     Defendant Chamberlain is liable for the violations set forth in this complaint because from 1989 to the present he directly participated in the violations described in this complaint.

27.     More specifically, he himself made or had input on the improper promotion, demotion, termination and discipline decisions that affected the plaintiffs as described in this complaint.

28.     He also discriminatorily harassed the plaintiffs during their employment in the Print Shop.

29.     Defendant Chamberlain is liable for the violations set forth in this complaint because from 1989 to the present he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

30.     More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

31.     Defendant Chamberlain is liable for the violations set forth in this complaint because from 1989 to the present he personally observed the improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

32.     Defendant Chamberlain is liable for the violations set forth in this complaint because from 1989 to the present he personally received and/or was aware of verbal and written complaints from the named and putative plaintiffs alleging improper harassment,

- 5 -

promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

33.     Defendant Chamberlain is liable for the violations set forth in this complaint because from 1989 to the present he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

34.     Defendant Chamberlain committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1989 to the present: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

35.     Defendant Chamberlain's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as an ITS or PCS.

### Defendant Barrett

36.     Defendant Barrett was employed by the State of New York as an Industrial Superintendent from 1995 to 2001 at ECF.

37.     As an Industrial Superintendent, defendant Barrett: hired, supervised, promoted, demoted, terminated and disciplined inmates within the Print Shop.

- 6 -

38.   As an Industrial Superintendent, defendant Barrett: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

39.   As an Industrial Superintendent, defendant Barrett received complaints concerning improper treatment of inmates in the Print Shop.

40.   As an Industrial Superintendent, defendant Barrett became aware of improper treatment of inmates in the Print Shop.

41.   As an Industrial Superintendent, defendant Barrett was responsible for the supervision of the personnel within the Print Shop.

42.   Defendant Barrett is liable for the violations set forth in this complaint because from 1995 to 2001 he directly participated in the violations described in this complaint.

43.   More specifically, he himself made or provided input on the improper promotion, demotion, termination and discipline decisions that affected the plaintiffs as described in this complaint.

44.   Defendant Barrett is liable for the violations set forth in this complaint because from 1995 to 2001 he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

45.   More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

46.   Defendant Barrett is liable for the violations set forth in this complaint because from 1995 to 2001 he personally observed the improper harassment, promotion, demotion

- 7 -

and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

47.     Defendant Barrett is liable for the violations set forth in this complaint because from 1995 to 2001 he personally received and/or was aware of verbal and written complaints from the plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

48.     Defendant Barrett is liable for the violations set forth in this complaint because from 1995 to 2001 he supervised all of the staff members employed in the Print Shop, including defendants Chamberlain, Kent, Pocobello, Rathbun and Sarno.

49.     One of defendant Barrett's duties in supervising individuals within the Print Shop was to make sure that these individuals did not engage in discriminatory behavior.

50.     However, defendant Barrett was negligent in the supervision of his subordinates.

51.     He did nothing to train or manage his subordinates in a way that would prevent the discriminatory conduct and policies and/or practices set forth in this complaint.

52.     Defendant Barrett's subordinates engaged in blatantly discriminatory conduct as set forth in this complaint, conduct of which defendant Barrett was, or should have been, aware.

- 8 -

53.     Defendant Barrett was so negligent in his management of his subordinates that although he knew, or should have known about this blatantly discriminatory behavior, he never disciplined or otherwise trained his subordinates to not engage in such behavior.

54.     Defendant Barrett is liable for the violations set forth in this complaint because from 1995 to 2001 he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

55.     Defendant Barrett committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1995 to 2001: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; he was negligent in supervising his subordinates who carried out the illegal actions and policies and/or practices set forth in this complaint; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

56.     Defendant Barrett's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as an Industrial Superintendent.

*Defendant Bennett*

57.     Defendant Bennett was employed by the State of New York as Superintendent of ECF from 1996 to 2002.

- 9 -

58.    As Superintendent, defendant Bennett created and implemented policies and/or practices which governed the operations of Elmira, including the operations of the Print Shop.

59.    As Superintendent, defendant Bennett received complaints concerning improper treatment of inmates in the Print Shop.

60.    As Superintendent, defendant Bennett became aware of the improper treatment of inmates in the Print Shop.

61.    As Superintendent, defendant Bennett supervised the personnel within Elmira, and more specifically, the staff of the Print Shop.

62.    Defendant Bennett is liable for the violations set forth in this complaint because from 1996 to 2002 the policies and/or practices he did implement, and failed to implement, governed the Print Shop and in turn resulted in the violations described in this complaint.

63.    Defendant Bennett is liable for the violations set forth in this complaint because from 1996 to 2002 he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

64.    More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

65.    As a Superintendent, defendant Bennett received complaints concerning improper treatment of inmates in the Print Shop.

- 10 -

66.     As a Superintendent, defendant Bennett became aware of improper treatment of inmates in the Print Shop.

67.     As a Superintendent, defendant Bennett was responsible for the supervision of the personnel within Elmira, and more specifically, the staff of the Print Shop.

68.     Defendant Bennett is liable for the violations set forth in this complaint because from 1996 to 2002 was aware, or should have been aware of the improper treatment of inmates in the Print Shop and he failed to remedy those violations upon becoming aware of such violations.

69.     Defendant Bennett is liable for the violations set forth in this complaint because from 1996 to 2002 he personally received and/or was aware of verbal and written complaints from the plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

70.     Defendant Bennett is liable for the violations set forth in this complaint because from 1996 to 2002 he supervised all of the staff members employed at Elmira, including defendants Chamberlain, Barrett, Thompson, Kent, Pocobello, Rathbun and Sarno.

71.     One of defendant Bennett's job duties in supervising his subordinates within Elmira was to make sure that these individuals did not engage in discriminatory behavior.

72.     However, defendant Bennett was negligent in the supervision of his subordinates.

73.     He did nothing to train or manage his subordinates in a way that would prevent the discriminatory conduct and policies and/or practices set forth in this complaint.

- 11 -

74. Defendant Bennett's subordinates engaged in blatantly discriminatory conduct as set forth in this complaint, conduct of which defendant Bennett was, or should have been, aware.

75. Defendant Bennett was so negligent in his management of his subordinates that although he knew, or should have known about this blatantly discriminatory behavior, he never disciplined or otherwise trained his subordinates to not engage in such behavior.

76. Defendant Bennett is liable for the violations set forth in this complaint because from 1996 to 2002 he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

77. Defendant Bennett committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1995 to 2001: he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; he was negligent in supervising his subordinates who carried out the illegal actions and policies and/or practices set forth in this complaint; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

78. Defendant Bennett's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as a Superintendent.

*John Conroy*

79. Defendant Conroy was employed by the State of New York as Director of Correctional Industries from approximately 1983 until 2003.

- 12 -

80.    The Division of Correctional Industries was responsible for the operation of the ECF Print Shop.

81.    As Director of Correctional Industries, defendant Conroy created and implemented policies and/or practices which governed the operations of the ECF Print Shop.

82.    As Director of Correctional Industries, defendant Conroy received complaints concerning improper treatment of inmates in the Print Shop.

83.    As Director of Correctional Industries, defendant Conroy became aware of the improper treatment of inmates in the Print Shop.

84.    As Director of Correctional Industries, defendant Conroy supervised the staff of the Print Shop.

85.    Defendant Conroy is liable for the violations set forth in this complaint because from 1983 until 2003 the policies and/or practices he did implement, and failed to implement, governed the Print Shop and in turn resulted in the violations described in this complaint.

86.    Defendant Conroy is liable for the violations set forth in this complaint because from 1983 until 2003 he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

87.    More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

88.    As a Director of Correctional Industries, defendant Conroy received complaints concerning improper treatment of inmates in the Print Shop.

- 13 -

89.     As a Director of Correctional Industries, defendant Conroy became aware of improper treatment of inmates in the Print Shop.

90.     Defendant Conroy is liable for the violations set forth in this complaint because from 1983 until 2003 he was aware, or should have been aware of the improper treatment of inmates in the Print Shop and he failed to remedy those violations upon becoming aware of such violations.

91.     Defendant Conroy is liable for the violations set forth in this complaint because from 1983 until 2003 he personally received and/or was aware of verbal and written complaints from the plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

92.     Defendant Conroy is liable for the violations set forth in this complaint because from 1983 until 2003 he supervised the staff members employed at Elmira, including defendants Chamberlain, Barrett, Thompson, Kent, Pocobello, Rathbun and Sarno.

93.     One of defendant Conroy's job duties in supervising his subordinates was to make sure that these individuals did not engage in discriminatory behavior.

94.     However, defendant Conroy was negligent in the supervision of his subordinates.

95.     He did nothing to train or manage his subordinates in a way that would prevent the discriminatory conduct and policies and/or practices set forth in this complaint.

- 14 -

96.     Defendant Conroy's subordinates engaged in blatantly discriminatory conduct as set forth in this complaint, conduct of which defendant Conroy was, or should have been, aware.

97.     Defendant Conroy was so negligent in his management of his subordinates that although he knew, or should have known about this blatantly discriminatory behavior, he never disciplined or otherwise trained his subordinates to not engage in such behavior.

98.     Defendant Conroy is liable for the violations set forth in this complaint because from 1996 to 2002 he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

99.     Defendant Conroy committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1983-2003: he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; he was negligent in supervising his subordinates who carried out the illegal actions and policies and/or practices set forth in this complaint; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

100.    Defendant Conroy's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as a Director of Correctional Industries.

- 15 -

*Janice A. Kent*

101.    Defendant Kent was employed by the State of New York as an ITS from 1998 to the present.

102.    As an ITS defendant Kent: supervised, hired, promoted, demoted, terminated and disciplined inmates within the Print Shop.

103.    As an ITS defendant Kent: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

104.    As an ITS defendant Kent received complaints concerning improper treatment of inmates in the Print Shop.

105.    As an ITS defendant Kent became aware of improper treatment of inmates in the Print Shop.

106.    Defendant Kent is liable for the violations set forth in this complaint because from 1998 to the present she directly participated in the violations described in this complaint.

107.    More specifically, she herself made or had input on the improper promotion, demotion, termination and discipline decisions that affected the plaintiffs as described in this complaint.

108.    She also discriminatorily harassed the plaintiffs during their employment in the Print Shop.

109.    Defendant Kent is liable for the violations set forth in this complaint because from 1998 to the present she created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

- 16 -

110.    More specifically, she created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

111.    Defendant Kent is liable for the violations set forth in this complaint because from 1998 to the present she personally observed the improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but she failed to remedy those violations upon becoming aware of such violations.

112.    Defendant Kent is liable for the violations set forth in this complaint because from 1998 to the present she personally received and/or was aware of verbal and written complaints from the named and putative plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but she failed to remedy those violations upon becoming aware of such violations.

113.    Defendant Kent is liable for the violations set forth in this complaint because from 1998 to the present she conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

114.    Defendant Kent committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1998 to the present: she personally participated in the improper employment decisions; she created and maintained the illegal policies and/or practices described in this complaint; she observed the improper employment decisions and

- 17 -

improper policies and/or practices but she failed to remedy those violations; and she saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but she failed to remedy those violations upon learning of such complaints.

115.    Defendant Kent's conspiracy was committed in furtherance of her own personal motives and was not part of her official duties as an ITS.

**Larry Pocobello**

116.    Defendant Pocobello was employed by the State of New York as an Assistant Industrial Superintendent ("AIS") from 1987 to 2001, and then was employed as an Industrial Superintendent from 2001 to the present.

117.    As an AIS defendant Pocobello: supervised, hired, promoted, demoted, terminated and disciplined inmates within the Print Shop.

118.    As an AIS defendant Pocobello: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

119.    As an AIS defendant Pocobello received complaints concerning improper treatment of inmates in the Print Shop.

120.    As an AIS defendant Pocobello became aware of improper treatment of inmates in the Print Shop.

121.    As an Industrial Superintendent defendant Pocobello: hired, supervised, promoted, demoted, terminated and disciplined inmates within the Print Shop.

122.    As an Industrial Superintendent defendant Pocobello: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

- 18 -

123. As an Industrial Superintendent defendant Pocobello received complaints concerning improper treatment of inmates in the Print Shop.

124. As an Industrial Superintendent defendant Pocobello became aware of improper treatment of inmates in the Print Shop.

125. As an Industrial Superintendent defendant Pocobello was responsible for the supervision of the personnel within the Print Shop.

126. Defendant Pocobello is liable for the violations set forth in this complaint because from 1987 to the present he directly participated in the violations described in this complaint.

127. More specifically, he himself made or had input on the improper promotion, demotion, termination and discipline decisions that affected the plaintiffs as described in this complaint.

128. He also discriminatorily harassed the plaintiffs during their employment in the Print Shop.

129. Defendant Pocobello is liable for the violations set forth in this complaint because from 1987 to the present he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

130. More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

131. Defendant Pocobello is liable for the violations set forth in this complaint because from 1987 to the present he personally observed the improper harassment,

- 19 -

promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

132.   Defendant Pocobello is liable for the violations set forth in this complaint because from 1987 to the present he personally received and/or was aware of verbal and written complaints from the named and putative plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

133.   Defendant Pocobello is liable for the violations set forth in this complaint because from 1987 to the present he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

134.   Defendant Pocobello committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1987 to the present: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

135.   Defendant Pocobello's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as an AIS or Industrial Superintendent.

- 20 -

*J. Jack Rathbun*

136.   Defendant Rathbun was employed by the State of New York as an ITS at Elmira from approximately 1980 until approximately 1990 and then served as a General Foreman at Elmira until his retirement in 1999.

137.   As an ITS and General Foreman, defendant Rathbun: supervised, hired, promoted, demoted, terminated and disciplined inmates within the Print Shop.

138.   As an ITS and General Foreman, defendant Rathbun: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

139.   As an ITS and General Foreman, defendant Rathbun received complaints concerning improper treatment of inmates in the Print Shop.

140.   As an ITS and General Foreman defendant Rathbun became aware of improper treatment of inmates in the Print Shop.

141.   Defendant Rathbun is liable for the violations set forth in this complaint because from 1980 to 1999 he directly participated in the violations described in this complaint.

142.   More specifically, he himself made or had input on the improper promotion, demotion, termination and discipline decisions that affected the plaintiffs as described in this complaint.

143.   He also discriminatorily harassed the plaintiffs during their employment in the Print Shop.

144.   Defendant Rathbun is liable for the violations set forth in this complaint because from 1980 to 1999 he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

145.   More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

146.   Defendant Rathbun is liable for the violations set forth in this complaint because from 1980 to 1999 he personally observed the improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

147.   Defendant Rathbun is liable for the violations set forth in this complaint because from 1980 to 1999 he personally received and/or was aware of verbal and written complaints from the named and putative plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

148.   Defendant Rathbun is liable for the violations set forth in this complaint because from 1980 to 1999 he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

- 22 -

149.   Defendant Rathbun committed illegal acts in furtherance of this conspiracy because, as described in this complaint from, 1980 to 1999: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations;  and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

150.   Defendant Rathbun's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as an ITS and General Foreman.

*George Sarno*

151.   Defendant Sarno was employed by the State of New York as an ITS from 1989 to the present.

152.   As an ITS defendant Sarno: supervised, hired, promoted, demoted, terminated and disciplined inmates within the Print Shop.

153.   As an ITS defendant Sarno: created and implemented policies and/or practices within the Print Shop as they related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

154.   As an ITS defendant Sarno received complaints concerning improper treatment of inmates in the Print Shop.

155.   As an ITS defendant Sarno became aware of improper treatment of inmates in the Print Shop.

- 23 -

156.    Defendant Sarno is liable for the violations set forth in this complaint because from 1989 to the present he directly participated in the violations described in this complaint.

157.    More specifically, he himself made or had input on the improper promotion, demotion, termination and discipline decisions that affected the plaintiffs as described in this complaint.

158.    He also discriminatorily harassed the plaintiffs during their employment in the Print Shop.

159.    Defendant Sarno is liable for the violations set forth in this complaint because from 1989 to the present he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

160.    More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

161.    Defendant Sarno is liable for the violations set forth in this complaint because from 1989 to the present he personally observed the improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

162.    Defendant Sarno is liable for the violations set forth in this complaint because from 1989 to the present he personally received and/or was aware of verbal and written complaints from the named and putative plaintiffs alleging improper harassment, promotion,

- 24 -

demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

163.   Defendant Sarno is liable for the violations set forth in this complaint because from 1989 to the present he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

164.   Defendant Sarno committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1989 to the present: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

165.   Defendant Sarno's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as an ITS.

*Dana M. Smith*

166.   Defendant Smith was employed by the State of New York as Deputy Superintendent for Program Services ("DSPS") from 1987 to 2001 at ECF.

167.   As DSPS defendant Smith: created and implemented policies and/or practices within the Print Shop as it related to hiring, supervising, promoting, demoting, terminating and disciplining inmates.

- 25 -

168.   As DSPS defendant Smith received complaints concerning improper treatment of inmates in the Print Shop.

169.   As DSPS defendant Smith became aware of improper treatment of inmates in the Print Shop.

170.   As DSPS defendant Smith was responsible for the supervision of the personnel within the Print Shop and on the ECF Program Committee.

171.   Defendant Smith is liable for the violations set forth in this complaint because from 1987 to 2001 he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

172.   More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper denial of promotion, termination, demotion and discipline of the plaintiffs.

173.   Defendant Smith is liable for the violations set forth in this complaint because from 1987 to 2001 he personally observed the improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

174.   Defendant Smith is liable for the violations set forth in this complaint because from 1987 to 2001 he personally received and/or was aware of verbal and written complaints from the plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that

- 26 -

furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

175.   Defendant Smith is liable for the violations set forth in this complaint because from 1987 to 2001 he supervised all of the staff members employed in the Print Shop, including defendants Chamberlain, Kent, Pocobello, Rathbun and Sarno, as well as the employees of the Program Committee.

176.   One of defendant Smith's duties in supervising individuals was to make sure that these individuals did not engage in discriminatory behavior.

177.   However, defendant Smith was negligent in the supervision of his subordinates.

178.   He did nothing to train or manage his subordinates in a way that would prevent the discriminatory conduct and policies and/or practices set forth in this complaint.

179.   Defendant Smith's subordinates engaged in blatantly discriminatory conduct as set forth in this complaint, conduct of which defendant Smith was, or should have been, aware.

180.   Defendant Smith was so negligent in his management of his subordinates that although he knew, or should have known about this blatantly discriminatory behavior, he never disciplined or otherwise trained his subordinates to not engage in such behavior.

181.   Defendant Smith is liable for the violations set forth in this complaint because from 1987 to 2001 he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

H:\Print Shop\Amended Complaint (Third).doc
10/3/2005 7:03 PM

182.   Defendant Smith committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1987 to 2001: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; he was negligent in supervising his subordinates who carried out the illegal actions and policies and/or practices set forth in this complaint; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

183.   Defendant Smith's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as a DSPS.

*James P. Thompson*

184.   Defendant Thompson was employed by the State of New York as Program Committee Chairperson from approximately 1996 to 2001 at ECF.

185.   As Program Committee Chairperson defendant Thompson hired, supervised, terminated and disciplined inmates within the Print Shop.

186.   As Program Committee Chairperson defendant Thompson created and implemented policies and/or practices within the Print Shop as it related to hiring, supervising, terminating and disciplining inmates.

187.   As Program Committee Chairperson defendant Thompson received complaints concerning improper treatment of inmates in the Print Shop.

188.   As Program Committee Chairperson defendant Thompson became aware of improper treatment of inmates in the Print Shop.

- 28 -

189.    Defendant Thompson is liable for the violations set forth in this complaint because from 1996 to 2001 he directly participated in the violations described in this complaint.

190.    More specifically, he himself made or provided input on the improper termination and discipline decisions that affected the plaintiffs as described in this complaint.

191.    Defendant Thompson is liable for the violations set forth in this complaint because from 1996 to 2001 he created and allowed to continue the policies and/or practices that led to the violations described in this complaint.

192.    More specifically, he created and allowed the policies and/or practices to continue that furthered the discriminatory, harassing, and retaliatory conduct that affected the plaintiffs as described in this complaint, including the improper termination and discipline of the plaintiffs.

193.    Defendant Thompson is liable for the violations set forth in this complaint because from 1996 to 2001 he personally observed the improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

194.    Defendant Thompson is liable for the violations set forth in this complaint because from 1996 to 2001 he personally received and/or was aware of verbal and written complaints from the plaintiffs alleging improper harassment, promotion, demotion and discipline decisions described in this complaint, as well as the improper policies and/or practices that furthered such decisions, but he failed to remedy those violations upon becoming aware of such violations.

- 29 -

195.    Defendant Thompson is liable for the violations set forth in this complaint because from 1996 to 2001 he conspired with, among others, the defendants who understood that plaintiffs would be subject to unlawful harassment, denial of promotions, demotions and discipline as set forth in this complaint.

196.    Defendant Thompson committed illegal acts in furtherance of this conspiracy because, as described in this complaint, from 1996 to 2001: he personally participated in the improper employment decisions; he created and maintained the illegal policies and/or practices described in this complaint; he observed the improper employment decisions and improper policies and/or practices but he failed to remedy those violations; and he saw and heard complaints concerning the improper employment decisions and improper policies and/or practices but he failed to remedy those violations upon learning of such complaints.

197.    Defendant Thompson's conspiracy was committed in furtherance of his own personal motives and was not part of his official duties as an Industrial Superintendent.

## FACTUAL BACKGROUND

### Previous Litigation and Order

198.    On April 13, 1993, Judge David Larimer, District Court Judge for the Western District of New York, found widespread race discrimination at ECF, and found that inmates at ECF were discriminated against in their employment at the facility.

199.    Judge Larimer entered an order and injunction designed to prohibit such discrimination in employment at the facility.

200.    Among other things, the Court ordered that defendants:

      a.    correct and eliminate the racial discrimination found to exist at ECF;

      b.    racially balance all jobs at ECF;

- 30 -

    c.     train employees at ECF to exercise their discretion in disciplinary matters in an even-handed way; and

    d.     handle all complaints or grievances from inmates in an expedited manner either through the Superintendent and/or the Office of Affirmative Action.

### *Defendants Disobey This Court's Order*

201.    Although the Court's Order required that defendants eliminate the racial discrimination in employment at ECF, such discrimination, as described below, continued unabated.

202.    The defendants failed to racially balance the jobs in the Print Shop, particularly with regards to the preferred jobs.

203.    Instead, non-Caucasian inmates were given worse jobs, and demoted and removed from the Print Shop at significantly higher rates because of their race, and in retaliation for complaining of discrimination.

204.    Defendants Chamberlain, Barrett, Kent, Pocobello, Rathbun, Sarno and Thompson were given unfettered discretion to demote and remove plaintiffs from the Print Shop.

205.    As shown by their comments, and the relevant statistics, those defendants used their discretion to ensure that jobs were not racially balanced within the Print Shop.

206.    Further, plaintiffs were constructively discharged from the Print Shop through excessively harsh treatment and racially charged comments and language.

207.    Even though defendants Chamberlain, Barrett, Bennett, Conroy, Pocobello, Rathbun, Smith and Thompson knew, or should have known, of the racially improper practices, they never trained their subordinates to exercise their discretion in an even-handed manner.

- 31 -

208.    To the contrary, their conduct and inaction rewarded the discriminatory behavior.

209.    Nor did the defendants handle the complaints of the plaintiffs in an expedited fashion.

210.    To the contrary, the complaints and grievances as to the systemic problems went unaddressed, and the relevant investigations were not completed.

211.    Further, the plaintiffs were subject to retaliation upon complaining about the discriminatory treatment.

212.    In general, defendants flouted the letter and spirit of this Court's Order by appearing to maintain superficial compliance with overall racial balancing requirements, while deliberately ignoring the Order's other provisions, and its spirit, requiring the elimination of racial discrimination in employment in ECF jobs.

### Pattern and Practice Of Racial Discrimination

213.    The standard operating procedure in the Print Shop was racial discrimination.

214.    Discriminatory action was not accidental, isolated incidents, but the standard operating procedure.

215.    For example, there are incredible statistical disparities within the Print Shop between Caucasian and non-Caucasian employees.

216.    For example, non-Caucasians are evaluated much more harshly and terminated more frequently than Caucasians because of their race.

217.    Non-Caucasians are evaluated much more harshly and demoted much more frequently than Caucasians because of their race.

- 32 -

218.   Caucasians are evaluated much more favorably and promoted at statistically significantly higher rates than non-Caucasians because of their race.

219.   Caucasians are evaluated much more favorably and paid at statistically significantly higher rates than non-Caucasians because of their race.

220.   The statistical disparities are supported by the individual incidents of discrimination and harassment, some examples of which are set forth in this complaint.

### Defendants' Policies Have a Disparate Impact on Plaintiffs

221.   As set forth above, the plaintiffs are members of a protected class and the policies and practices of the defendants have a statistically significant impact on non-Caucasians.

222.   The facially neutral policy which triggers these disparities is the subjective evaluation process used by the defendants—a process that gives unfettered discretion to the defendants in making employment decisions regarding the plaintiffs.

223.   These evaluations in turn are used to make the statistically significant (and racially biased) decisions discussed above.

### Defendants' Treatment of Plaintiffs is Motivated By Racial Animus

224.   As discussed above, the individual treatment of the named plaintiffs supports their claims of a pattern and practice of discrimination.

225.   As discussed above, the individual treatment of the plaintiffs demonstrates that the named and putative plaintiffs were subject to the disparate impact of defendants' illegal policies and/or practices.

- 33 -

226.   As discussed above, the individual treatment of the plaintiffs demonstrates that they were subject to the same illegal policies and/or practices as the other class members and hence their claims are common and typical of the class members.

227.   The individual treatment of the plaintiffs also demonstrates the discriminatory disparate treatment by defendants that affected the named plaintiffs and the putative plaintiffs.

228.   The following examples of disparate treatment are by way of example only and each plaintiff has additional examples of discrimination against himself by the defendants, and examples he witnessed against other non-Caucasians.

229.   Plaintiff Gould was employed in the Print Shop from January 1994 through March 1999.

230.   During his employment, plaintiff Gould was subjected to the discriminatory practices and policies found in the Print Shop.

231.   For example, in the Spring of 1998, plaintiff Gould was denied a promotion when the promotion was awarded to a Caucasian inmate, Charlie Mixon in accordance with the discriminatory practices and policies of the Print Shop.

232.   Plaintiff Gould was demoted by defendant Pocobello in February 1999 and his pay was reduced from $0.45 to $0.38 per hour.

233.   Eventually, despite plaintiff Gould's good performance record, defendants Pocobello and Barrett sought to have plaintiff Gould removed from the Print Shop in accordance with the discriminatory practices and policies of the Print Shop.

- 34 -

234.   Further, defendants Pocobello and Barrett sought to have plaintiff Gould removed from the Print Shop after he filed a grievance concerning the discrimination he experienced and in retaliation for filing the grievance.

235.   Plaintiff Gould was terminated from the Print Shop because of discrimination.

236.   Plaintiff Reynolds was employed in the Print Shop from August 1994 through September 1999.

237.   Plaintiff Reynolds's bonus was docked, although Caucasian inmates were not docked.

238.   Plaintiff Reynolds was issued several reprimands by defendants Chamberlain, Kent and Sarno in accordance with the discriminatory policies and practices in effect.

239.   In addition, such reprimands were issued in retaliation for plaintiff Reynolds filing a lawsuit concerning the discrimination.

240.   Plaintiff Ponder was employed in the Print Shop from July 1997 through March 1999.

241.   During his employment in the Print Shop, plaintiff Ponder was also subjected to discrimination.

242.   For example, plaintiff Ponder received reprimands from defendants Chamberlain, Sarno and Pocobello, was demoted and removed from the Print Shop without justification in accordance with the discriminatory practices and policies of the Print Shop.

243.   In addition, plaintiff Ponder was docked his bonus by defendants Chamberlain and Pocobello due to such reprimands, although Caucasian inmates were not docked in accordance with the discriminatory practices and policies of the Print Shop.

- 35 -

244.   Plaintiff Ponder was also retaliated against for filing a grievance concerning the treatment he experienced while working in the Print Shop.

245.   Plaintiff Mack worked in the Print Shop from December 1998 through April 1999.

246.   Plaintiff Mack was also discriminated against because of his race.

247.   For example, plaintiff Mack was subjected to reprimands from defendant Chamberlain and defendants Pocobello and Chamberlain requested that plaintiff Mack be removed from the Print Shop in accordance with the discriminatory practices and policies of the Print Shop.

248.   Plaintiff Mack was also docked his bonus by defendants Chamberlain and Mack in accordance with the discriminatory practices and policies of the Print Shop.

249.   In addition, when plaintiff Mack was not removed from the Print Shop, plaintiff Mack was subjected to additional discrimination by defendant Pocobello who demoted plaintiff Mack.

250.   Plaintiff Mack was retaliated against for filing a grievance concerning the discrimination he experienced in the Print Shop.

251.   Plaintiff Mack was also discriminated against because of his religion.  Plaintiff Mack was reprimanded and docked pay for preparing to attend a religious service.

252.   Plaintiff Mack was further retaliated against through an assault which occurred when an officer left his post.  The attack was due to the deliberate indifference of the ECF staff towards plaintiff Mack.

- 36 -

### FIRST CAUSE OF ACTION
#### *Violation of Court Order*

253.   Plaintiffs reallege the above paragraphs as if fully restated herein.

254.   Defendants violated their obligations directly and through subterfuge in regards to Judge Larimer's Order dated April 13, 1993 and are liable to plaintiffs.

### SECOND CAUSE OF ACTION
#### *§ 1983*

255.   Plaintiffs reallege the above paragraphs as if fully restated herein.

256.   Defendants violated their obligations under 42 U.S.C. § 1983 and are liable to plaintiffs.

### THIRD CAUSE OF ACTION
#### *§ 1981*

257.   Plaintiffs reallege the above paragraphs as if fully restated herein.

258.   Defendants violated their obligations under 42 U.S.C. §1981 and are liable to plaintiffs.

### FOURTH CAUSE OF ACTION
#### *§ 1985*

259.   Plaintiffs reallege the above paragraphs as if fully restated herein.

260.   Defendants violated their obligations under 42 U.S.C. §1985 and are liable to plaintiffs.

### FIFTH CAUSE OF ACTION
#### *§ 1986*

261.   Plaintiffs reallege the above paragraphs as if fully restated herein.

262.   Defendants violated their obligations under 42 U.S.C. §1986 and are liable to plaintiffs.

- 37 -

### SIXTH CAUSE OF ACTION
### HRL

263.    Plaintiffs reallege the above paragraphs as if fully restated herein.

264.    Defendants violated their obligations under the New York Human Rights Law and are liable to plaintiffs.

### SEVENTH CAUSE OF ACTION
### New York State Constitution

265.    Plaintiffs reallege the above paragraphs as if fully restated herein.

266.    Defendants violated their obligations under the New York State Constitution and are liable to plaintiffs.

### EIGHTH CAUSE OF ACTION
### CPLR § 8601

267.    Plaintiffs reallege the above paragraphs as if fully restated herein.

268.    Defendants violated their obligations under § 8601 of the CPLR and are liable to plaintiffs.


**WHEREFORE**, plaintiffs demand judgment against defendants in their favor and that they be given the following relief:

a.    permanently restrain defendants from engaging in the aforementioned discrimination and retaliation; and

b.    an award to plaintiffs of the value of their lost wages, back pay, including lost fringe benefits, which resulted from the discriminatory acts and practices of defendant; and

c.    an award to plaintiffs of the value of their lost future wages and lost future fringe benefits which resulted from the discriminatory acts and practices of defendants, or other appropriate equitable relief; and

- 38 -

d.   an award to plaintiffs of the actual losses sustained by plaintiffs as a direct result of the violation; and

e.   an award to plaintiffs for civil penalties provided by statute; and

f.   an award of consequential damages sustained by plaintiffs, as a result of the discriminatory acts and practices of defendants; and

g.   an award of compensatory damages in an amount determined by the jury to be able to reasonably compensate plaintiffs for the humiliation, indignity, embarrassment, damage to reputation, emotional distress, emotional suffering and the loss of enjoyment of life endured as a result of the acts and practices of defendants; and

h.   an award of attorneys' fees, expenses, expert fees and costs incurred by plaintiffs in vindicating their rights; and

i.   an award of punitive damages, in an amount determined by the jury to penalize defendant for its malicious and intentional violations of federally and state protected rights; and

j.   an award of pre and post judgment interest; and

k.   such other and further legal or equitable relief as this Court deems to be just and appropriate.

Dated: _____, 2005

DOLIN, THOMAS & SOLOMON LLP

By: _____
     J. Nelson Thomas, Esq.
      *Attorneys for Plaintiffs*
     693 East Avenue
     Rochester, New York 14607
     Telephone: 585.272.0540
     nthomas@theemploymentattorneys.com

- 39 -

# EXHIBIT H

# Elmira Prison – Print Shop

## Sep. 30, 2005

Michael J. Guilfoyle
Dataconsult

   I was requested to analyze payroll data for inmates who worked in the print shop at the New York State Prison at Elmira to determine whether there were racial differences in rates of pay and employment practices. The data was the payroll transaction listings for weekly pays from April 1994 to December 1999 for 211 inmates. The payroll records were produced by defendants. The inmates received from 1 to 298 weekly payments over a 69 month period. I selected 185 inmates who had racial identifiers and job tenure of at least two months in the print shop because periods of brief employment might distort any findings across the racial groups. The inmates of Hispanic and Other racial groups were combined into one group due to small number of inmates of Native American, Pacific Island etc. groups into the Hispanic/Other category to allow for meaningful analysis. The number of inmates working in the print shop ranged from 33 to 51 workers per pay period during the almost six year period. The descriptive statistics for the racial profile for all the selected inmates and their length of tenure follows –

## Racial Composition of Selected Inmates

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Black | 110 | 59.5 | 69.5 | 59.5 |
| | H/O | 54 | 29.2 | 29.2 | 88.7 |
| | White | 21 | 11.4 | 11.4 | 100.0 |
| | Total | 112 | 100.0 | 100.0 | |

The racial composition of the print shop matches very closely the testimony about the general prison population as stated in the deposition by Dana Smith – Elmira's First Deputy Superintendent.

## TENURE of EMPLOYMENT in MONTHS by RACE

| Race | Mean | Median | Minimum | Maximum |
|------|------|--------|---------|---------|
| Black | 15.14 | 10.0 | 2 | 69 |
| Hispanic/Other | 14.15 | 9.5 | 2 | 69 |
| White | 23.90 | 16.0 | 2 | 69 |

A statistical analysis was performed to test whether the length of employment in the print shop for the three racial groups were markedly different - statistically significant – probability of error (i.e. P value) less than 5 percent or .05 or two standard deviations. The test chosen to compare the average length of tenure across the racial groups was a univariate analysis of variance. This test ascertains whether the length of employment vary between the three racial groups. The result was significant (F statistic = 3.306 with a P value le .039, more than 2 standard deviations). This indicates that the inmates in the different racial groups had different lengths of tenure. The average tenure difference was between Blacks and Whites – 8.76 months (P value le .018, more than 3 standard deviations). The monthly average difference between Hispanic/Other and Whites was 9.76 months (P value le .015, more than 3 standard deviations). Both differences are statistically significant that clearly indicates that White inmates had longer tenure in the print shop than the inmates in the Black and Hispanic/Other racial groups over the sixty-nine month period.

The inmates are assigned to various positions in the print shop. The hourly pay rates start at .16 cents and move up to .65 cents per hour. There are five pay grades in the print shop which indicate levels of experience and expertise. I used the rates of pay to investigate the differences in the reimbursement practices for the three racial groups. The pay rates were provided in the document (Bates A000897). The pay grade and rate guidelines established in 1995 are:

## PAY GRADES – PRINT SHOP

| Grade | Step1 | Step2 | Step3 |
|-------|-------|-------|-------|
| 1 | .16 | .22 | .25 |
| 2 | .26 | .29 | .32 |
| 3 | .32 | .35 | .38 |
| 4 | .38 | .42 | .45 |
| 5 | .65 | | |

In order to determine the differences between the racial groups a monthly average pay rate was computed for 185 inmates. The descriptive statistics for the monthly pay rates over the almost six year period were –

## MONTHLY PAY RATES by RACE

| Race | Mean | Median | Minimum | Maximum |
|------|------|--------|---------|---------|
| Black | .3008 | .290 | .16 | .45 |
| Hispanic/Other | .3178 | .298 | .16 | .65 |
| White | .4194 | .420 | .16 | .65 |
| All Inmates | .3254 | .320 | .16 | .65 |

Another univariate analysis of variance was performed. This analysis will test whether the patterns of monthly pay rates vary between the three racial groups. The result was highly significant (F statistic = 210.664 with a P value le .000, more than 4 standard deviations). This clearly indicates that the inmates in the different racial groups were not paid at the same levels. A comparison of the greatest average monthly difference was between Blacks and Whites – 11.86 cents (P value le .000, more than 4 standard deviations). The monthly average difference between Hispanic/Other and Whites was 10.16 cents (P value le .000, more than 4 standard deviations). Both differences are statistically significant that clearly indicates that White inmates were paid more than the inmates in the Black and Hispanic/Other racial groups over the sixty-nine month period.

A tabular analysis was undertaken to determine patterns of pay reductions or grade demotions for the inmates. A comparison of the inmate's highest pay rate and his final pay rate was made. If an inmate had a decline at any time in their pay rate over his tenure in the print shop, he was labeled as having been demoted. The table below documents the patterns of demotions.

## PAY REDUCTION/DEMOTION by RACE

| | | | Demotion Reduction | | Total |
|---|---|---|---|---|---|
| | | | .00 | 1.00 | |
| Newrace | Black | Count | 82 | 28 | 110 |
| | | Expected Count | 88.0 | 22.0 | 110.0 |
| | | % within newrace | 74.5% | 25.5% | 100.0% |
| | | % within demotion_reduction | 55.4% | 75.7% | 59.5% |
| | | % of Total | 44.3% | 15.1% | 59.5% |
| | H/O | Count | 46 | 8 | 54 |
| | | Expected Count | 43.2 | 10.8 | 54.0 |
| | | % within newrace | 85.2% | 14.8% | 100.0% |
| | | % within demotion_reduction | 31.1% | 21.6% | 29.2% |
| | | % of Total | 24.9% | 4.3% | 29.2% |
| | White | Count | 20 | 1 | 21 |
| | | Expected Count | 16.8 | 4.2 | 21.0 |
| | | % within newrace | 95.2% | 4.8% | 100.0% |
| | | % within demotion_reduction | 13.5% | 2.7% | 11.4% |
| | | % of Total | 10.8% | .5% | 11.4% |
| Total | | Count | 148 | 37 | 185 |
| | | Expected Count | 148.0 | 37.0 | 185.0 |
| | | % within newrace | 80.0% | 20.0% | 100.0% |
| | | % within demotion_reduction | 100.0% | 100.0% | 100.0% |
| | | % of Total | 80.0% | 20.0% | 100.0% |

There were 37 demotions/ pay reductions for the selected 185 inmates. Black inmates were 75.7% of all the reductions and Hispanic/Others had the balance of the reductions (i.e. 21.6%). However, only one white inmate was demoted or reduced in pay. The Black and Hispanic/Other inmates had higher levels of pay reductions/demotions – 25.5% and 14.8% respectively. If there was a race neutral demotion policy, one would have expected 4 white inmates to be demoted over almost six year period rather than reported

frequency of one. A statistical test to ascertain whether the patterns of demotion or pay reduction across racial groups were different was performed. A measure of association called Chi-Square was chosen. The result was also significant (Chi-Square 6.00, P = .05) which indicates that Blacks and Hispanic/Others were penalized at much higher rates. Appendix I is a graphical representation of the tenure distribution.

   The overall findings are that there are clear-cut differences across the three racial groups in tenure, pay rates and demotion practices. White inmates have average periods of employment in the print shop almost 50 percent longer than that of Black and Hispanic/Other inmates. This pattern of differences becomes more marked when the analysis of pay rates indicates that Whites receive 33% more wages than the two other groups. White inmate's average position was pay grade level 4 – 2. Hispanic/Other inmate's average position was between pay grades level 2 – 3 and 3 – 1. Black inmate's average position was between pay grades level 2 – 2 and 2-3. The examination of demotions/pay reductions indicates marked racial differences in the rate that Black and Hispanic/Other inmates are disciplined in the print shop. All these findings are contrary Mr. Smith's testimony about no racial differences in rendition and employment practices in the print shop. These results suggest that there is a strong bias against non-white inmates working the Elmira prison print shop when tenure, rate of pay and demotions are examined.

**Appendix I**

### Bar Chart



**Addendum – Expert Report**
**Sept. 30, 2005**


Consulting Fees to date - $6195.00 (44.25 hours @ $140.00)


Testimony - *Hammond, et al. v. Lowe's Home Centers, 02-cv-2509, United States District*
*Court for the District of Kansas*
Expert Report - Dec. 28, 2004
Deposition - March 9, 2005

Publications – List of Academic publications dealing applied Social Science topics will be
provided at a later date , if required.

# MICHAEL J. GUILFOYLE

302-737-4451
Dataconsult99@hotmail.com

**SUMMARY:**

Applied statistician with 30 years experience in data analysis and computer applications. Strong background in research design, data collection, complex database structures, data conversion, statistical computing (SAS and SPSS), multivariate analysis, program evaluation and survey research areas.

**MAJOR ACCOMPLISHMENTS:**

DATA ANALYSIS
- Consultant at several research universities
- Consultant to several Fortune 500 Corporations
- Consultant for Data Acquisition and Conversion for Class Action Cases
- Extensive experience with identifying and integrating data sources to enable and enhance research tasks and decision-making
- Instructor for applied and multivariate statistics at both graduate and undergraduate levels

STATISTICAL COMPUTING
- Strong computing and data handling skills
- Extensive experience with SAS and other major statistical software packages on multiple platforms
- Instructor for computer assisted data analysis techniques

PROJECT MANAGEMENT
- Supervision of data collection, data entry, programming personnel and research analysts for survey and follow-up studies
- Development of time schedules and budgets

**WORK HISTORY:**

UNIVERSITY OF QUEENSLAND, Department of Geography
Brisbane, Queensland, Australia
HUMAN GEOGRAPHY & ANALYTICAL METHODS INSTRUCTOR
1976 - 1981.

Michael Guilfoyle
Page 2

GRIFFITH UNIVERSITY, School of Australian Environmental Studies,
Brisbane, Queensland, Australia
URBAN STUDIES & DATA ANALYSIS INSTRUCTOR
1978 - 1982

GRIFFITH UNIVERSITY, Institute of Applied Social Research
Brisbane, Queensland, Australia
DATA ANALYSIS CONSULTANT
1978 - 1982

UNIVERSITY OF DELAWARE, Center for Applied Demography & Survey Research
SURVEY RESEARCH ANALYST
1982 - 1986

UNIVERSITY OF PENNSYLVANIA, School of Arts & Science Computing Facility
STATISTICAL & DATA ANALYSIS CONSULTANT
1985 - 1988

UNIVERSITY OF PENNSYLVANIA & CHILDREN'S HOSPITAL OF
PHILADELPHIA - PEDIATRIC EPIDEMIOLOGY & HEALTH SERVICES
RESEARCH UNIT
STATISTICAL & DATA ANALYSIS CONSULTANT
1988 -1990.

UNIVERSITY OF PENNSYLVANIA, University Data Center
MANAGER, STATISTICAL AND DATA ANALYSIS
1988 - 1994

UNIVERSITY OF PENNSYLVANIA, INFORMATION & COMPUTER SERVICES
Academic Computer Services
SPECIALIST-DATA ANALYSIS AND MANAGEMENT
1994 - 2000

UNIVERSITY OF PENNSYLVANIA, School of Nursing
STATISTICAL AND DATA ANALYSIS CONSULTANT
Center for Nursing Research
1995 - 1999

Center for the Study of Nursing Care in Serious Illness
1995 - 1996

Acting Director - Computer Information and Computer Services
July 1996 - October 1996

Michael Guilfoyle
Page 3

UNIVERSITY OF PENNSYLVANIA, Van Pelt Library
STATISTICAL ANALYSIS CONSULTANT
1995 - 1999

UNIVERSITY OF PENNSYLVANIA, School of Social Work
STATISTICAL AND DATA ANALYSIS CONSULTANT
1995 - 2002

Research Associate
Center for Youth Policy
2000 – 2002

ECONSULT CORPORATION
Senior Associate
2001 – 2003

APPLIED ECONOMIC RESEARCH CONSORTIUM LLC
Consultant
2003 - Present

EDUCATION:

BACHELOR OF ARTS - Political Science
FLORIDA STATE UNIVERSITY- College of Social Sciences
December 1973

MASTER OF SCIENCE - Geography/Applied Statistics
FLORIDA STATE UNIVERSITY- College of Social Sciences
March 1976

PH.D. PROGRAM - Urban Social Change/Research Methods
UNIVERSITY OF DELAWARE - College of Urban Affairs & Public Policy
1982 - 1987

PERSONAL DATA:

MARRIED     - THREE CHILDREN
CITIZENSHIP - U.S.A.
HEALTH      - GOOD
MILITARY SERVICE - U.S. COAST GUARD