UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JERRY REYNOLDS,


                                    Plaintiff,

                                                                    DECISION AND ORDER

                                                                    99-CV-6228L


                    v.

DAVE BARRETT,
Industrial Superintendent of Elmira Correctional Facility,
LARRY POCCOBELLO,
Assistant Industrial Superintendent of Elmira,
JACK RATHBUN,
General Foreman of Elmira Print Industry,
TERRY CHAMBERLIN,
Industrial Training Supervisor of Elmira Print Industry,
FLOYD BENNETT,
Superintendent of Elmira Correctional and Reception Center,
GEORGE SARNO,
Industrial Training Supervisor of Elmira Print Industry,
JANET KENT,
Industrial Training Supervisor of Elmira Print Industry,
DANA M. SMITH,
Deputy Superintendent of Elmira,
JAMES P. THOMPSON,
Senior Correction Counselor of Elmira,
JOHN CONROY,
Director of Correctional Industry,
Individually and in their official capacities,


                                    Defendants.

_____

KAY GOULD,

                              Plaintiff,

              v.                                    99-CV-6503L

TERRY CHAMBERLIN,
Industry Training Supervisor,
LARRY POCOBELLO,
Industry Assistant Superintendent,
DAVE BARRETT,
Industry Superintendent,
JACK RATHBIN,
Industry Foreman,
JANICE KENT,
Industry Training Supervisor,
FLOYD BENNETT,
Correctional Facility's Superintendent,

                              Defendants.

ANTHONY MACK,

                              Plaintiff,

              v.                                    00-CV-6436L

DAVID BARRETT,
Industry Superintendent at Elmira Correctional
and Reception Center,
LARRY POCOBELLO,
Industry Assistant Training Superintendent at Elmira,
TERRY CHAMBERLIN,
Industry Training Supervisor at Elmira
JACK RATHBURN,
Industry Foreman at Elmira,
JOHN CONROY,
Director of Correctional Industries for DOCS,
GEORGE SARNO,
Industrial Training Supervisor in Elmira Print Shop,
FLOYD BENNETT,
Superintendent at Elmira,
DANA M. SMITH,
Deputy Superintendent of Programs at Elmira,
JIM THOMPSON,
Program Committee Chairman at Elmira,
                              Defendants.

JOSEPH SERGIO PONDER,

                           Plaintiff,

            v.                                              00-CV-6440L

TERRY CHAMBERLIN,
JACK RATHBUN,
GEORGE SARNO,

                           Defendants.

These four cases arise out of alleged racial discrimination against inmates at the Elmira Correctional Facility, which is operated by the New York State Department of Correctional Services ("DOCS") in Elmira, New York.  The four African-American plaintiffs, Jerry Reynolds, Khalib Gould, Anthony Mack, and Joseph Ponder, all of whom were at all relevant times incarcerated at Elmira, allege that they were subjected to discrimination on account of their race in connection with their inmate jobs in the Print Shop at Elmira.  Plaintiffs assert claims under 42 U.S.C. §§ 1983 and 1985.

Several motions are now pending before the Court.  Plaintiffs have moved to amend their complaints, by filing a single consolidated complaint governing all four actions.  Plaintiffs have also moved to certify a class under Rule 23 of the Federal Rules of Civil Procedure.  In addition, defendants have moved for summary judgment dismissing all the plaintiffs' claims.

## BACKGROUND

These cases have their collective genesis in this Court's decision in *Santiago v. Miles*, an action that was filed in 1986 by a class of inmates at Elmira against various prison officials, alleging

widespread discrimination at Elmira on the basis of race, in violation of the Fourteenth Amendment to the United States Constitution. The case went to trial, and on October 1, 1991, this Court found that black and Hispanic inmates at Elmira had been "systematically subjected ... to discrimination on the basis of race in the areas of housing and job assignment and in the imposition of discipline." 774 F.Supp. 775, 801. The Court directed the parties to work together to create a plan to end that discrimination and to agree on the terms of a remedial injunction to be issued by the Court.

On April 13, 1993, the court adopted a plan, previously agreed to by the parties, setting forth various provisions and safeguards designed to remedy the systemic discrimination at Elmira. For example, the plan provided that inmate jobs at Elmira were required to be assigned in such a way that the percentage of black and Hispanic inmates in certain "preferred" jobs, *see id.* at 782, including jobs in the Print Shop, would correspond to the percentage of blacks and Hispanics in Elmira's inmate population. *Santiago*, 86-CV-694, Dkt. #128 ¶ 9. The plan further provided that the judgment incorporating the plan would "continue in full force and effect and bind the defendants as well as their successors, agents, and employees until modified or terminated by the Court ...," and that "[i]n the event that plaintiffs believe that defendants are not in compliance with this Judgment, ... plaintiffs may seek relief from this Court." *Santiago*, Dkt. #128 ¶ 29.

The first of the four cases at bar, *Reynolds v. Chamberlin*, was filed on June 3, 1999. Reynolds, who began working in the Print Shop in 1994, alleges that his incentive bonus pay was docked for alleged errors that, if committed by a white inmate, would not have resulted in a similar reduction in pay. Reynolds Second Amended Complaint (Dkt. #6) ¶ 20. Reynolds was terminated from the Print Shop in September 1999, after he was found guilty on several charges involving possession of contraband in his cell.

- 4 -

The second of these actions, *Gould v. Barrett*, was filed on October 5, 1999. Gould, who also began working in the Print Shop in 1994, alleges that he was passed over for promotion, demoted, and eventually removed from the Print Shop in March 1999, ostensibly for poor performance, but in reality on account of his race, and in retaliation for his having filed grievances about various matters related to the Print Shop. Gould Complaint (Dkt. #1) ¶¶ 13-96.

The complaint in *Mack v. Barrett* was filed on March 27, 2000. Mack began working in the Print Shop in 1998. He alleges that despite his initially satisfactory job performance, he was repeatedly, and unfairly, blamed by his supervisors for printing press malfunctions. After receiving a series of inmate counseling notifications for those alleged problems, Mack was programmed out of the Print Shop in April 1999. He contends that he was programmed out because of his race, and also in retaliation for his having filed grievances about some of these matters.

The fourth action, *Ponder v. Chamberlin*, was commenced on September 7, 2000. Ponder began working in the Print Shop in 1997. He was programmed out of the Print Shop in March 1999, after having also received a number of inmate counseling notifications. Plaintiff alleges that his termination was the result of race discrimination and retaliation for his prior complaints about various matters.

In November 2000, the Court appointed counsel for plaintiffs in all four of these actions. In October 2001, plaintiffs' counsel filed a motion to consolidate these actions for all purposes under Rule 42(a), and for leave to file a consolidated amended complaint. *Reynolds*, Dkt. #47.[1]

---

[1]Unless otherwise noted, all further references to documents and docket entries relating to these four actions generally will be to docket numbers as entered in *Reynolds*.

On November 15, 2001, Magistrate Judge Jonathan W. Feldman issued an order directing plaintiffs to refile a proposed amended complaint providing more detail as to the nature of each plaintiff's claims against each individual defendant. Dkt. #51. That order also set forth a briefing schedule on the motion to amend, should defendants oppose the motion.

By stipulation and order entered on December 20, 2001, these cases were consolidated for purposes of discovery. Dkt. #52. That stipulation and order also set forth the parties' agreement and understanding that "no adverse inferences shall be drawn and neither side shall be prejudiced in any way because either (I) the defendants stipulate to proceed with discovery on a consolidated basis, or (ii) plaintiffs agree to amend the complaints after discovery has been completed."

Pursuant to a scheduling order issued on May 2, 2005, discovery in these actions was closed on August 31, 2005. Dkt. #87. On October 3, 2005, plaintiffs again filed a motion for leave to file an amended consolidated complaint. Dkt. #99. Defendants filed papers in opposition to the motion, after which the Court heard oral argument and reserved decision on the motion.

While the motion to amend was pending, defendants filed summary judgment motions in each of these actions on October 29, 2008. Dkt. #118. Two days later, on October 31, 2008, plaintiffs filed their class certification motion. Dkt. #123. The Court heard oral argument on those motions on April 8, 2009.

## DISCUSSION

### I. Timing and Sequence of the Motions

"Courts have held that in general, issues relating to class certification should be decided before a decision on the merits is rendered." *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 44 (W.D.N.Y.

2009) (citing cases). *See also* Fed. R. Civ. P. 23(c)(1) (district court should determine whether a class is maintainable "[a]t an early practicable time after a person sues or is sued as a class representative"). That is particularly true in cases in which certification is sought under Rule 23(b)(3), which requires that absent class members be given an opportunity to exclude themselves from the class. Once the opt-out date has passed in a Rule 23(b)(3) action, absent members are bound by the judgment.

"There are exceptions to that general principle, however," and in particular, "there is authority that a defendant can waive any objection to a decision on the merits prior to, or simultaneous with, a decision on class certification." *Mendez*, 2009 WL 2584831, at \*4. *See, e.g.*, *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (defendant may elect to seek summary judgment prior to decision on class certification as a "way to try to knock ... off [the action] at low cost," by disqualifying the named plaintiffs as proper class representatives, in order to moot the question whether to certify the suit as a class action); *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995) ("By obtaining summary judgment before notice had been sent to the class, the defendants waived their right to have such notice given and to obtain a judgment that was binding upon the class").

In fact, the Advisory Committee Notes to the 2003 amendments to Rule 23 (which changed subdivision (c)(1)(A) to require that the determination whether to certify a class be made "at an early practicable time," rather than "as soon as practicable") expressly recognize "the many valid reasons that may justify deferring the initial certification decision," including the possibility that "[t]he party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified." *See also Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 (D.C. Cir. 2001) ("where the merits of the plaintiffs' claims

can be readily resolved on summary judgment, where the defendant seeks an early disposition of those claims, and where the plaintiffs are not prejudiced thereby, a district court does not abuse its discretion by resolving the merits before considering the question of class certification"); *Jamieson v. Vatterott Educ. Ctrs., Inc.*, 259 F.R.D. 520, 526 (D.Kan. 2009) ("As a practical matter, it is appropriate to clarify the nature and scope of the pending claims before determining their suitability for class action treatment").

In each of the cases at bar, defendants have moved for summary judgment, dismissing the claims in their entirety. They have therefore implicitly waived any right they may have had to have class certification issues decided first. In addition, since it appears that at least some of plaintiffs' individual claims may be subject to dismissal, I believe that "[r]eversing the usual order of disposition [may] spare[] both the parties and the court a needless, time-consuming inquiry into certification." *Curtin*, 275 F.3d at 92.

## II. Defendants' Motions for Summary Judgment

## A. General Principles

Although each of the four plaintiff's complaints is *sui generis* and must be evaluated on its own merits, they are similar in some respects. Each plaintiff asserts claims under 42 U.S.C. §§ 1981, 1983, 1985 and 1986. The gist of their claims is that plaintiffs were subjected to some adverse actions, including their removal from the Print Shop and loss of pay, on account of their race. Each plaintiff also asserts some variation of a claim or claims for what they describe as a breach of defendants' "duty to protect," but what they apparently mean is that the supervisory defendants failed to prevent or stop the alleged violations from occurring.

The proposed amended class action complaint is similar. As proposed, it would also assert claims under §§ 1981, 1983, 1985 and 1986, as well as a claim alleging that "[d]efendants violated their obligations directly and through subterfuge in regards to Judge Larimer's Order dated April 13, 1993 and are liable to plaintiffs," Dkt. #101 at 56 ¶ 254, a claim under the New York Human Rights Law, Exec. L. § 296, a claim under the New York State Constitution, and a claim for attorney's fees under N.Y. C.P.L.R. § 8601.

Despite the variety of claims asserted, the § 1983 claims lie at the heart of these cases. And though § 1983 provides a vehicle by which to seek redress against state actors for a wide range of constitutional violations, it is plaintiffs' equal protection claims that form the core of their § 1983 claims.

Although a prison inmate "has no right to any particular prison job, ... prison officials cannot discriminate against him on the basis of his race in work assignments." *LaBounty v. Adler*, No. 89 Civ. 4242, 1999 WL 961776, at *2 (S.D.N.Y. Oct. 21, 1999). *See also LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991) (holding that inmate had stated facially valid equal protection claim based on allegations that he and other black inmates were subjected to more stringent requirements for certain work assignments than similarly situated white inmates, and remanding to district court for further proceedings).

Both sides here agree that in analyzing plaintiffs' equal protection claims, the Court should employ the burden-shifting paradigm used in Title VII cases under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Williams v. Federal Bureau of Prisons and Parole Comm'n*, 85 Fed.Appx. 299, 305 (3d Cir. 2004) (stating that *McDonnell Douglas* burden-shifting framework applies to prisoners' equal protection claims of racial discrimination) (citing *Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997)); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107,

123 (2d Cir. 2004) (applying *McDonnell Douglas* framework to § 1983 employment discrimination case by public school psychologist); *Reece v. Low*, No. CIV-05-307, 2009 WL 2761923, at *13 (W.D.Okla. Aug. 27, 2009) (evaluating inmate's claim of race discrimination with respect to his prison job under *McDonnell Douglas*).

Under that approach, the plaintiff must first establish a *prima facie* case by demonstrating that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse action in connection with his job; and (4) the action occurred under conditions giving rise to an inference of discrimination. If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse action. If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, by showing that the defendant's proffered reason is a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-04; *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498-99 (2d Cir. 2009); *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). "In such situations, plaintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against [him] was more likely than not a product of discriminatory animus." *Leibowitz*, 584 F.3d at 504.

Retaliation claims are analyzed under a similar framework. The chief differences are that to establish the first element, the plaintiff must show that he engaged in protected activity (such as filing a grievance), and that with respect to the fourth element, there must be evidence that retaliation was a motivating factor for the adverse job action. *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003); *Webster v. Fischer*, 694 F.Supp.2d 163, 182 (N.D.N.Y. 2010).

## B. Plaintiff's Statistical Evidence

In support of their claims of race discrimination, plaintiffs rely in part on an expert report prepared by Michael J. Guilfoyle (Dkt. #125, Ex. H). Guilfoyle, a professional applied statistician, analyzed certain data concerning 185 inmates who worked at the Print Shop between April 1994 and December 1999.

Guilfoyle states that his analysis of the data shows that, to a statistically significant degree, white inmates had a longer tenure in the print shop, and were paid more, than non-white inmates during that time period. He also states that non-white inmates were penalized (through demotions or pay reductions) "at much higher rates" than white inmates. Dkt. #125-3 at 57. For example, according to Guilfoyle, the mean tenure of employment in the Print Shop during the period that he examined was 23.9 months for white inmates, and 15.14 months for black inmates. The average hourly pay rate was 42 cents for white inmates and 30 cents for black inmates. Guilfoyle opines that "[t]hese results suggest that there is a strong bias against non-white inmates working the Elmira prison print shop when tenure, rate of pay and demotions are examined." *Id.*

Statistical evidence can be used to bolster an individual claim of disparate treatment, but "[s]tatistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she in particular has been discriminated against." *Baron v. New York City Dep't of Educ.*, No. 06-CV-2816, 2009 WL 1938975, at * 6 (E.D.N.Y. July 7, 2009) (quoting *Drake v. Delta Air Lines, Inc.*, No. 94-CV-5944, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005), *aff'd*, 216 Fed. Appx. 95 (2d Cir. 2007)); *see also E.E.O.C. v. Texas Instruments, Inc.*, 100 F.3d 1173, 1185-86 (5th Cir. 1996) ("statistics are impotent, without more," to create fact issue about whether individual employee was discriminated against).

"Rather, statistical evidence can be used along with *other* evidence to prove discriminatory intent." *Bussey v. Phillips*, 419 F.Supp.2d 569, 583 (S.D.N.Y. 2006) (citing *Catanzaro v. Weiden*, 140 F.3d 91, 96 (2d Cir. 1998)). *See also Simpson v. Leavitt*, 437 F.Supp.2d 95, 104 (D.D.C. 2006) (statistical "evidence generally is not conclusive [in disparate-treatment cases] and will instead serve to 'add[] "color"' to the inquiry into the employer's decision-making process") (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)). Regardless of the weight that should be given to Guilefoyle's conclusions, then, the Court must also examine each plaintiff's evidence concerning his own individual circumstances to determine whether he has presented a viable claim that can withstand defendants' motion for summary judgment.

## C. Individual Plaintiffs' Discrimination Claims

### 1. Reynolds

There is no dispute here that plaintiff Reynolds has satisfied the first and third elements of his *prima facie* case: he is black, and he suffered an adverse action in connection with his job at the Print Shop, specifically the loss of a bonus in 1998. Although Reynolds was also terminated from the Print Shop in 1999, he does not appear to allege that his termination, which followed Reynolds's conviction on charges involving contraband in his cell, was the result of discrimination. His claim is based solely on the loss of the bonus in 1998.

What is at issue here is whether plaintiff has met the other two prongs of his *prima facie* case: whether his job performance was satisfactory, and whether the adverse action occurred under conditions giving rise to an inference of discrimination. Even viewing the evidence in the light most favorable to plaintiff, I conclude that he has not done so.

The primary decisionmaker responsible for denying plaintiff his bonus was Jerry Rathbun, who was plaintiff's Industrial Training Supervisor ("ITS"), a civilian employee of DOCS who supervised the Print Shop. On November 18, 1998, Rathbun issued an inmate counseling notification to Reynolds (Dkt. #121, Ex. B) stating, "You were told by me today 11-18-98 that if you had to have more plates made for [a certain job] to see me not for you to go back and see Goulds to find out how many more you had to do over." *Id.* at 2371. Rathbun added, "You sent Leake from prepress back to see Goulds to find out how many more, when you are told by me to see me thats [sic] what I want done. You will loose [sic] your bonus untill [sic] the cost of the plates & material is paid for $57.00 worth." *Id.*

At his deposition in this action, Rathbun explained that Reynolds "was running back to the bindery and finding out which page he screwed up that they couldn't use and then running into the camera room and getting plates made over. He went around me." Dkt. #121 Ex. E at 87. In other words, according to Rathbun, plaintiff had made a mistake in running the machine, and was trying to cover up his mistake by redoing the plates that had been affected by the mistake, "without telling [Rathbun] that [plaintiff had] screwed it up to start with ... ." *Id.*

There is no evidence, however, that Rathbun's stated basis for issuing the counseling notification was false, or that he harbored any racial animus toward Reynolds. In opposition to defendants' summary judgment motion, plaintiff states that "Rathbun ... often made racial remarks in plaintiff's presence ...," Plaintiff's Mem. of Law (Dkt. #130) at 14, but plaintiff's own deposition testimony fails to support that assertion. When he was asked if had "ever hear[d] Mr. Rathbun make a negative racial remark," Reynolds replied that "Mr. Rathbun was an extremely racial man," but the only specifics that he could offer to support that allegation were that on one occasion, Rathbun called the inmates in the Print Shop together and "ma[d]e an announcement that ... he heard that a lot of the

inmates were saying that he's a racist," and that Rathbun "ma[d]e a declaration in front of the entire shop that, 'I don't think that I have a racist bone in my body.'" Reynolds Depo. Tr. (Dkt. #121 Ex. A) at 142.

When asked if he could recall any particular "racial comments Mr. Rathbun made," however, plaintiff simply responded that "it wouldn't, you know, be fair to him. I wouldn't want to attempt to recite what they [sic] said." *Id.* at 143. When defense counsel replied that was simply "giving [Reynolds] an opportunity to tell ... what [he] recall[ed]," Reynolds stated, "[I]n all honesty, I don't want to sit here at the risk of maybe misquoting what he said. I don't want to take the chance of trying to, under oath, swear to he said this or that, you know." *Id.*

The only statements by Rathbun to which plaintiff did testify, then, were Rathbun's statements to the Print Shop inmates to the effect that he was *not* a racist, and that any impressions of him to the contrary were mistaken. Those statements might indicate that Rathbun believed, or was aware, that some inmates considered him to be a racist–a perception that he sought to dispel–but by themselves they are not probative of any actual racial animus on Rathbun's part.

Reynolds has also submitted (as have the other three plaintiffs) a copy of a poster that allegedly hung on the wall of Rathbun's office. On the left-hand side of the poster is a photograph of an ape (described by plaintiff as a gorilla, though it appears to be an orangutan) staring directly into the camera, and on the right side are the words, "Whoever regards work as pleasure can sure have a HELL of a good time in this institution." Dkt. #132 Ex. J.

Plaintiff apparently seeks to have the factfinder draw an inference of racial animus from that poster. There does not appear to be any evidence, however, that the poster itself conveyed any inherent or obvious racial message, or that Rathbun ever said or did anything to imply that the poster was targeted at any particular inmate or group of inmates, black or otherwise. In the absence of other

evidence suggesting that Rathbun harbored any racial animus, this poster is not probative of discriminatory animus on Rathbun's part. *Cf. Gregory v. Widnall*, 153 F.3d 1071, 1074-75 (9th Cir. 1998) ("A single drawing of a monkey on a memo circulated to senior NCOs, accompanied by the verbal explanation that it was intended to remind officers not to 'get the monkey off their back' by passing their responsibilities to others, is not sufficient to raise a jury question" concerning plaintiff's race discrimination claim).

In addition, the evidence detailing the working relationship between plaintiff and Rathbun does not indicate that it was particularly discordant, much less that it was marked by racial problems or overtones. Plaintiff's work records from the Print Shop show that while Rathbun occasionally gave Reynolds criticism, it was in the nature of constructive criticism that related to specific problems, which Rathbun described with some particularity. Rathbun's criticisms were also generally accompanied by specific recommendations for improvement. Moreover, Rathbun did give Reynolds favorable and encouraging comments as well, such as his statements in a progress report dated April 15, 1998, that Reynolds seemed "to have gotten it together this last 56 days[.] I hope it continues." Dkt. #121 Ex. B at 2362.

More to the point, Reynolds has not demonstrated that any white inmates were treated differently under similar circumstances. "To make out a prima facie claim of [unlawful discrimination under Title VII], the plaintiff must meet the first three elements of the *McDonnell Douglas* test and must demonstrate 'that a similarly situated employee not in the relevant protected group received better treatment.'" *Smith v. New Venture Gear, Inc.*, 320 Fed.Appx. 33, 35 (2d Cir. 2009) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)). *See, e.g.*, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938 (7th Cir. 2007) (because plaintiff failed to identify a similarly situated individual whom her employer treated differently, district court properly granted employer's motion

for summary judgment dismissing plaintiff's claim of disability discrimination). In the end, all that plaintiff has is his subjective belief that the criticisms he received, and the denial of the $57 bonus, were unfair and unfounded, plus Guilfoyle's conclusion that there was a general pattern of discrimination against non-white inmates in the Print Shop during Reynolds's tenure there.

That is not enough to give rise to a genuine issue of material fact. As stated, though statistical evidence may be used to support a plaintiff's claim of disparate treatment, there must also be some other admissible, probative evidence that the individual plaintiff was discriminated against. Reynolds's subjective belief that Rathbun's actions were unfair, and his allegation that on one occasion Rathbun made statements intended to counter any notion that he was a racist do not constitute such evidence. *See Chavarria v. Despachos Del Notre, Inc.*, 390 F.Supp.2d 591, 600 (S.D.Tex. 2005) (plaintiffs' "subjective belief of [age] discrimination" and statistical evidence that purportedly showed that a majority of the people terminated by defendant were older, were insufficient to show that plaintiffs had been discriminated against); *Wado v. Xerox Corp.*, 991 F.Supp. 174, 188-89 (W.D.N.Y. 1998) (stating that plaintiff's "personal disagreement with his employer's evaluation of him is not enough to create an inference of discrimination," and that plaintiff's statistical evidence was not probative of whether plaintiff had been discriminated against), *aff'd sub nom. Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999).


## 2. Gould

As with Reynolds, there is no dispute that Gould has demonstrated two of the elements of his *prima facie* case. He is black, and he suffered adverse job actions, in the form of bonus deductions, demotion, and his eventual removal from the Print Shop. In addition, there is no dispute that Gould filed grievances about various matters prior to his termination.

Although Gould, whose highest position within the Print Shop was that of Quality Control ("QC") inspector, received a number of favorable progress reports, his supervisors frequently faulted him for conversing socially with other inmates in the Print Shop when he was supposed to be working. *See* Dkt. #72 Ex. B.[2] In a counseling notification dated October 16, 1998, and signed by defendants ITS Terry Chamberlain[3] and Assistant Industrial Superintendent Larry Pocobello, Gould was advised that he had been "continually observed remaining in just one area expecting problems to be brought to [him]," instead of moving throughout the work area as he was supposed to do, and that he "spen[t] most of the day in conversation with a few people around [him]." *Id.*

In mid-November 1998, another ITS, Janice Kent, wrote in Gould's Inmate Progress Report that Gould's "standing around having gab sessions" would "no longer be tolerated ... ." *Id.* On November 30, Larry Pocobello issued Gould an inmate counseling notification stating that Gould had "been counseled too many times" about "gabbing" on the job, and that "[t]his is the last [notification] you will receive because you will be terminated if you do not start doing your job."

On December 4, 1998, Pocobello submitted a written request that Gould be removed from the Print Shop, based on Gould's alleged failure to heed the "warn[ings that he had been given] that unless his work performance improves, we will request his removal." Pocobello's request was denied, and Gould continued to work in the Print Shop.

The decision not to remove Gould at that time was apparently made by what was known as the Program Committee. The evidence indicates that when a request was made to remove an inmate

---

[2]Notices, reports, or other documents contained in Gould's work record can be found in Dkt. #72, Ex. B, which was filed manually. Exhibit B is not paginated, but the documents contained therein are arranged chronologically.

[3]Chamberlain's name is misspelled "Chamberlin" in some of the pleadings in these actions.

from the Print Shop, the inmate would be interviewed by the Program Committee, which would then act upon the request. Gould testified that he would typically appear before a civilian and a DOCS sergeant, who would review his record and render a decision on whether he should be removed from, or sent back to, the Print Shop. Gould Depo. Tr. (Dkt. #72 Ex. A) at 141. On one occasion, for example, Gould stated that the civilian committee member told Gould, "I'm looking at the record. I don't see why they sent you here," and "I don't know what this is about. Whatever they ask you, just do it." *Id.* at 142. Gould was then sent back to work at the Print Shop. *Id.*[4]

In Gould's January 13, 1999 progress report, Kent indicated that Gould had "improved on the standing around talking too much," but in a February 5, 1999 report, Kent stated that Gold had "go[ne] back to [his] previous unacceptable patterns." Kent added, "This is unacceptable and cannot be tolerated."

Following the issuance of that report, Pocobello submitted a second written request, dated February 8, 1999, asking that Gould be removed from the Print Shop. That request came on the heels of a February 5 inmate counseling notification in which Gould was faulted for failing to bring a certain problem to the attention of an ITS. In the February 8 request, Pocobello stated that Gould had "received numerous counselings and poor evaluations," and that "[h]is work remains inconsistent, with no apparent hope for improvement." That request, too, was denied, however. Gould Depo. Tr. at 148.

Gould testified that when he went before the Program Committee following the issuance of the February 5 notification, the committee told him that "there was nothing they could do because [he] had a grievance pending [concerning an earlier matter] and they would have to send [him] back

---

[4]It is not clear if that particular interview related to Pocobello's December 4, 1998 removal request, or a later request.

to the print shop." He further testified, however, that when he "walked back into the print shop" on February 11, Pocobello handed him a new counseling notification, stating as he did so, "[I]f I can't get you one way, I'll get you another." Gould Depo. Tr. at 148.

In that February 11 notification, Pocobello wrote that "due to [Gould's] continued poor work performance and documented inability to do [his] assigned job properly," Gould was being demoted and his pay "dropped one step to grade 4, step 1 with no longevity."[5] In that notification, Pocobello also instructed Gould, "[Y]ou need to do your assigned job as a QC Inspector, if you do not improve your work performance other disciplinary measures will be required."

Gould was given additional inmate counseling notifications on February 23 and 26, 1999, both of which were again authored by Pocobello. The first of these asserted that Gould had committed a certain error on February 19, and at the bottom of the notification form, Pocobello wrote that because Gould "continue[d] to ignore the counselings" that he had been given, "you leave me with no option but to recommend you for a program change." The February 26 notification alleged that Gould had essentially refused to do any work at all that day.

Following those two counseling notifications, Pocobello again submitted a written request that Gould be programmed out of the Print Shop. This time his request was approved, and Gould was removed from his job in the Print Shop.

Viewing the evidence in the light most favorable to plaintiff, I conclude that Gould has failed to demonstrate the existence of genuine issues of material fact concerning his claims of unlawful discrimination and retaliation. Defendants are entitled to summary judgment on Gould's claim.

---

[5] Apparently, "longevity" was a designation that carried with it some benefits. Gould testified that longevity "mean[t] that [the inmate] had two years in the grade that" he was in and that he had "maintained a good attitude and behavior and work skills to the two-year period, and [that he] was upgraded and given longevity status." Gould Depo. Tr. at 147.

Gould's inmate records are replete with entries showing that he was repeatedly reprimanded for spending too much time standing around and "gabbing" with other inmates. The record before me also shows that this problem is what ultimately led to Gould's removal from the Print Shop. What is missing, however, is evidence upon which a factfinder could reasonably conclude that Gould's race was a motivating factor in his removal.

Plaintiff's testimony does suggest that Pocobello, at some point, became determined to have Gould removed from the Print Shop. There is no evidence, however, that Pocobello was motivated by racial animus. All that the record shows is that Pocobello became increasingly dissatisfied with Gould's performance as a QC inspector, principally due to Gould's habit of chatting with other inmates instead of moving around the Print Shop to monitor their work. Again, there is simply no indication in the evidence that plaintiff's race was a factor in Pocobello's repeated requests that Gould be removed from the Print Shop.

Gould did testify, mostly in general terms, that he was held to a higher, or different standard than two white QC inspectors, Joe Razcinsky and Charlie Mixon. Raczinsky, like Gould, was a QC inspector in the bindery area of the Print Shop, and Mixon was a QC inspector in the press area, which apparently was adjacent to the bindery area. *See* Gould Depo. Tr. at 124. Gould testified, in effect, that Razcinsky and Mixon were not required to continually make rounds, checking other inmates' work, as plaintiff was required to do (or faulted for not doing).

Plaintiff's testimony in this regard fails to give rise to a genuine issue of material fact. Gould's subjective belief that Razcinsky and Mixon were not subjected to the same rules as he, or that they were treated more leniently than plaintiff, is insufficient to show that he and they were similarly situated, and that Razcinsky and Mixon were in fact treated differently from plaintiff for the same type of conduct. There is no evidence that Gould actually knew whether Razcinsky or Mixon were ever

reprimanded, counseled or disciplined under circumstances similar to plaintiff's. He testified, in fact, that he "d[id]n't know if there's any other inmates that have notations in their evaluations indicating that they can't talk or they talk too much." Gould Depo. Tr. at 162. Absent such evidence, Gould's subjective perception that he was singled out for harsh treatment is not enough to create a genuine issue of material fact. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) (stating that plaintiff's "subjective belief that she worked more than other paralegals ... is not enough to survive summary judgment," and that even if she could show that her workload was heavier, that would not be enough to establish a Title VII claim, "[a]bsent any evidence suggesting that discrimination motivated work distributions"); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (black plaintiff did not produce sufficient information to show whether two white employees' alleged absenteeism and insubordination were of "comparable seriousness" to the conduct for which plaintiff was discharged to overcome employer's motion for summary judgment); *Tran v. Tyco Electronics Corp.*, No. 07-CV-953, 2008 WL 4482389, at *7 (D.Or. Sept. 29, 2008) (Title VII plaintiff's "subjective feeling" that his supervisor took longer to review his work than that of his coworkers, with adverse effects on plaintiff's productivity statistics, was not sufficient to defeat employer's motion for summary judgment, since plaintiff conceded that he did not have any evidence to corroborate that allegation).

In short, Gould's impression that he was treated worse than similarly situated white employees is not enough. To overcome a well-founded motion for summary judgment, plaintiff must come forward with some evidence, beyond his purely subjective impression, to support that assertion. He has failed to do so. *See Purchase v. Astrue*, 324 Fed.Appx. 239, 242 (4th Cir. 2009) (plaintiff's unsupported allegation that her supervisors criticized her job performance but did not criticize the same conduct of similarly situated male employees was insufficient to raise an issue of material fact

and survive summary judgment); *O'Hazo v. Bristol-Burlington Health Dist.*, 599 F.Supp.2d 242, 259 (D.Conn. 2009) (plaintiff's statement that he was subjected to disparate treatment because similarly situated employees "received more favorable treatment" and were "subject to less criticism," by itself, did not establish disparate treatment or an inference of discrimination, absent "specific examples of disparate treatment," and amounted to nothing more than plaintiff's subjective "perceptions of his working conditions").

Gould's failure in that regard is all the more significant in light of the abundant evidence that he was removed from the Print Shop for nondiscriminatory reasons relating to his poor performance, particularly his tendency to spend too much time in "gab sessions" with other inmates. That habit of his was commented upon by multiple supervisors, and, ultimately, the Program Committee approved his removal for that reason. Gould Depo. Tr. 150-51. There is no evidence that this reason was false, or that defendants were in fact motivated, even in part, by discrimination. *See Henry v. Wyeth Pharmaceuticals, Inc.*, ___ F.3d ___, 2010 WL 3023807, at *19 (2d Cir. 2010) (regardless of whether employer's explanation also furnished part of the reason for the adverse action, plaintiff must prove that "discrimination played a role in an adverse employment decision"); *Watkins v. Nabisco Biscuit Co.*, 224 F.Supp.2d 852, 868-71 (D.N.J. 2002) (even assuming *arguendo* that plaintiff's evidence was sufficient to make out a prima facie case of discriminatory discharge, plaintiff did not produce evidence tending to establish that defendants' legitimate, nondiscriminatory reasons for terminating him were pretexts for discrimination).[6]

---

[6]Gould also alleges that Pocobello "falsified" a document, specifically an inmate counseling notification dated October 16, 1998. Apparently what plaintiff means is that Pocobello authored the document, but had Chamberlain sign it, "to give the appearance that he [Pocobello] wasn't the only person that was writing these counseling notifications." Gould Depo. Tr. at 175. This notification, however, was signed by both Chamberlain and Pocobello, and nowhere

(continued...)

Gould's allegations concerning the other defendants fare no better. With respect to Chamberlain, plaintiff has submitted some evidence that, viewed in the light most favorable to Gould, indicates that Chamberlain displayed some racial animus in general, but there is insufficient evidence that any such animus on Chamberlain's part played a role in any actions taken against Gould.

Plaintiff has submitted a copy of what appears to be an internal, hand-written memorandum dated October 27, 1999, authored by "diversity trainer" Arthur Cunningham. Plaintiff's Ex. M (Dkt. #83-6) at 2. Cunningham wrote in that memo that on September 22, 1999, he attended, or conducted, a diversity training session at Elmira. Chamberlain also attended that session. Cunningham wrote that during that session he "spoke to [his] African heritage, but emphasis was given to America being the best country." That statement allegedly prompted Chamberlain to ask, "If you're so proud of this country, why do you refer to yourself as an African American? There is nothing redeeming about Africa." *Id.* According to Cunningham, he responded that he "had a great deal to be proud of," and he also mentioned his Native American heritage, to which Chamberlain allegedly replied, "There is nothing redeeming about Native Americans either." *Id.*

Cunningham also wrote that in a later session that same day, someone else in the group–apparently another trainer–was discussing a situation involving discrimination against some particular ethnic group (which group is not clear from Cunningham's memo), when Chamberlain interjected, "They don't deserve to have dogs. They feed them with food stamps." *Id.* Cunningham

---

[6](...continued)
does it say or indicate which of them wrote it. Even if it was written by Pocobello, then, nothing about it would support an inference that Pocobello was trying to create the false appearance that Chamberlain, and not he, was the author. By signing it, Chamberlain attested to the truth and accuracy of the document's contents, regardless of who physically wrote it.

In any event, as with plaintiff's other allegations concerning Pocobello, there is simply no evidence that plaintiff's race had anything to do with the issuance of this notification.

stated in his memo that Chamberlain's "attitude and demeanor permeated the entire group and put a subdued negative atmosphere on the entire training." *Id.* At his deposition in this case, Cunningham testified that he believed that these latter comments by Chamberlain referred to a group of African Americans who lived in a housing project near the Elmira Correctional Facility. Dkt. #83-6 at 6 (Tr. p. 46).

Although these statements are some evidence of racial animus on Chamberlain's part, they are insufficient to create a genuine issue of material fact with respect to Gould's claims, because Chamberlain was not a decisionmaker with respect to Gould's removal from the Print Shop. The only evidence concerning any role that Chamberlain played concerning Gould's job is the October 16, 1998 notification referred to above (which Gould alleges was actually written by Pocobello), and a memorandum authored by Chamberlain dated March 30, 1998, and directed to Gould's inmate folder, stating that Gould had been warned about "too much talking and not enough working," and that this behavior "must stop ... ."

The contents of those two documents, however, simply echoed what the other supervisors in the Print Shop also said about Gould, on multiple occasions: that he spent too much time talking, and not enough time doing his job. They were two of many such comments and criticisms that Gould received, from several supervisors, during his time in the Print Shop, and there is no indication that they played a significant, or any, role in his ultimate removal from the Print Shop. Chamberlain's alleged statements at the diversity training session, which had nothing to do with Gould's removal from the Print Shop, by themselves are simply too tangential to Gould's claims to give rise to any issue of material fact. *See Henry*, ___ F.3d at ___, 2010 WL 3023807, at *13 (although a reasonable juror could certainly have considered certain remarks made by plaintiff's supervisor to have been discriminatory, they had "little probative value in the context of this case," since supervisor in

question was not involved in any of the decisions that plaintiff alleged were discriminatory); *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1252-53 (10th Cir. 2006) (supervisor's alleged reference to another African-American employee as a "monkey" did not create genuine issue of fact with regard to plaintiff's race discrimination claim, since supervisor did not participate in decision to terminate plaintiff); *Holt v. Roadway Package Systems, Inc.*, 506 F.Supp.2d 194, 201 (W.D.N.Y. 2007) (alleged use of racially offensive remarks by non-decisionmaker, unrelated to employment decision at issue, do not support an inference of discrimination by the employer).

Plaintiff's allegations against the other defendants merit little comment, as they are almost nonexistent, insofar as racial animus is concerned. Plaintiff has alleged, and indeed to a great extent it is undisputed, that defendants criticized his work performance on a number of occasions, or that they approved or concurred in criticisms made by Pocobello and Chamberlain. There is simply no evidence, however, that any of the other defendants harbored any unlawful animus, either toward black inmates in general or toward plaintiff in particular.

Gould's retaliation claim is subject to dismissal for largely the same reasons as his claims of race discrimination. Although plaintiff did file two grievances while he was in the Print Shop. there is insufficient evidence upon which a jury could reasonably conclude that the fact of those grievances played any role in any actions taken by defendants toward Gould.

One grievance, filed in July 1997, complained about the loss of a $4.33 bonus. That grievance was thus filed well over a year before Gould's removal from the Print Shop, and plaintiff does not appear to contend that he was removed out of retaliation for that grievance.

Gould filed another grievance in December 1998, and supplemented it in February 1999, complaining of unfair treatment and discrimination. The problems concerning his work performance were ongoing at the time, however, and continued unabated until his removal. *See Kasper v.*

*Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation"). The fact that Gould filed grievances during this stretch of time does not, standing alone, transform his unsubstantiated claims into viable retaliation claims, nor can it shield him from legitimate, nondiscriminatory discipline or adverse job actions. *See Coleman v. Beale*, 636 F.Supp.2d 207, 211 (W.D.N.Y. 2009) ("inmates must not be able to insulate themselves from disciplinary action by filing grievances against prison officials") (quoting *Hill v. Thomas*, No. Civ. A. G-04-0647, 2008 WL 901498, at *6 (S.D.Tex. Mar. 31, 2008)); *see also Wallace v. Sparks Health System*, 415 F.3d 853, 858 (8th Cir. 2005) (filing an EEOC complaint does not insulate an employee from discipline for legitimate reasons). There is no evidence that defendants ratcheted up their criticisms of Gould after he filed that grievance; rather, the evidence shows only that they continued to criticize his work habits as before, until he was finally removed from the Print Shop.

### 3. Mack

Mack began working in the Print Shop in 1998. Although he initially received satisfactory progress reports, he was blamed by his supervisors on several occasions for causing, or allowing, mechanical malfunctions in his press machine. Mack received a number of inmate counseling notifications for such alleged problems, all of which he contends were unfounded and discriminatory. Mack Rule 56 Statement (Dkt. #73) at 2-9. Mack was programmed out of the Print Shop in April 1999.

As stated, Mack received some favorable reviews during his time in the Print Shop, but even in the favorable reviews, Mack was sometimes faulted for allowing or causing his machine to break down. On January 11, 1999, for example, Chamberlain stated that Mack had "done OK with set up

and operation of machine," but that he needed to "work on and improve in keeping [the] machine clean and maintained." Dkt. #63 Ex. B(D). Chamberlain stated that Mack's overall "production [wa]s good," but that the "machine seem[ed] to keep having break down problems," which according to Chamberlain were mostly attributable to operator error.

Three days later, on January 14, 1999, Chamberlain issued Mack a notification stating that Mack's machine "had a major mechanical break down caused by poor operation and/or lack of attention ... ." Mack was advised that he would not receive a bonus "until the machine is back up and running ... ." *Id.*

The next day, January 15, 1999, Chamberlain, with Pocobello's approval, requested that Mack be removed from the Print Shop due to "poor work performance and several hundred dollars" worth of damage to his machine. The Program Committee denied that request without comment. *Id.*

Mack filed a grievance over the January 14 notification. Plaintiff's Appx. Ex. C. The IGRC granted the grievance in part, on the ground that a different inmate–plaintiff Ponder–had been directly responsible for the machine in question at the time of the underlying incident. The IGRC also stated that an inmate's bonus could not be withheld prospectively, as Chamberlain had attempted to do. *Id.* Superintendent Bennett, however, overturned the IGRC's decision and denied the grievance. *Id.* Bennett gave no reason for his decision, other than to state that it was based on the report of an investigation into the matter conducted by Pocobello. *Id.*

On February 24, 1999, defendant ITS George Sarno issued an inmate counseling notification to Mack indicating that Mack's press had been repaired and that Mack had been given some instruction on the proper way to operate the machine. Sarno advised Mack that he "should run the press at a slower speed and <u>not</u> wide open as [Mack's] reaction time to problems is slow." Sarno

added, "You need to become more familiar with the press and its operations. (Walk before you run)."

In that notification, Sarno also stated that he had observed Mack standing with his back to the press, talking to other inmates, while the machine was in operation. He indicated that this could easily lead to problems because Mack would not be able to react in time if the machine malfunctioned. Sarno noted that Mack had "lost [a] bonus for damage to this press," adding, "I don't think either of us want to see this happen again." *Id.*

In a progress report dated March 8, 1999, Chamberlain stated, "During this period the machine has been down more than running because of damage caused by not paying attention to machine when running it and poor cleaning and oiling of machine. There is a problem with talking to other workers while running machine too." Both Chamberlain and Mack signed that report. *Id.*

On March 15, 1999, Chamberlain issued a notification to Mack stating that on that date, Chamberlain had checked Mack's machine and "found that the rollers had not been oiled and cleaned the way that [Mack] ha[d] been instructed to do several times by all staff. This seems to be an on going problem!" Chamberlain stated, "I know that you are the only assistant on this machine, but it must be maintained the way you were instructed by staff." Chamberlain advised Mack that if he needed to, he should "get assistance from staff or other disciplinary action will be taken," adding, "Last warning!" *Id.*

Two weeks later, Chamberlain issued another notification to Mack. This one stated that when Chamberlain checked Mack's machine on that date, he found it covered in oil, including "all covers, lamps, feed tables, [and] rollers ... ." Chamberlain stated, "This was intentionally done which caused damage to [the] machine and was a safety hazard to the area." He added, "You have been shown and counseled several times on your machine operation and clean up. You have shown me that you can't

follow directions or don't want too [sic]. Because of this I have no choice but to put you in for a program change." *Id.*

According to plaintiff, he initially was programmed out of the Print Shop as a result of this notification, but after he spoke to defendant Assistant Superintendent Barrett (whom plaintiff referred to as his deposition as "Barry"), Barrett allowed him to return to the Print Shop. Mack Depo. Tr. (Dkt. #63 Ex. A) at 139-40.

Upon his return to the Print Shop on April 6, 1999, Mack was presented with a notification signed by Pocobello and Barrett, stating that based on Barrett's decision, Mack was being given "one more opportunity to improve [his] work performance," and that effective immediately, Mack was "removed from the envelope press to prevent further damage to the press, and reassigned as a bindery worker." Dkt. #63 Ex. B. Mack's pay was also reduced. The notification stated, "This is your last opportunity to turn around your poor performance. Any shop rule violation or counseling will result in your immediate termination." *Id.*

That did not take long to occur. The very next day, Chamberlain issued a misbehavior report charging Mack with disobeying an order. He stated that on the morning of April 7, Sarno had informed Chamberlain that on the afternoon of April 6, after Chamberlain had left for the day, Sarno "saw Mack back in the press area where Mack was given direct orders to stay away from." Sarno asked Mack what he was doing there, to which Mack replied that "it was OK he [Mack] was just helping out." According to the report, Sarno was not sure at the time if Mack had been ordered to stay out of the press area, but Chamberlain confirmed that Mack had been given several orders to that effect. Chamberlain wrote that Mack "deliberately disobeyed orders and left his area without any permission ... ." *Id.*

The day after issuing that report, Chamberlain submitted another request that Mack be removed from the Print Shop. This time his request was approved, and Mack was reassigned on April 18, 1999.

Concerning the merits of plaintiff's claims, I begin with his claim of unlawful retaliation against Chamberlain, because it is with respect to that claim that plaintiff's evidence is the strongest.

Mack alleges that he was retaliated against for filing a grievance over an inmate counseling notification issued by Chamberlain on January 14, 1999. In that notification, Chamberlain stated that Mack's machine had suffered a major breakdown due to "poor operation and/or lack of attention," and that Mack would not receive a bonus until the problem was fixed.

Plaintiff's grievance is dated January 18, 1999. Plaintiff's Appx. Ex. C. Plaintiff testified at his deposition that shortly after that, Chamberlain stated to him, "You guys want to write shit and I'm going to have to respond to this, and I'm going to start writing shit." Mack Depo. Tr. at 99.[7]

Although Chamberlain had criticized Mack's work performance on some occasions before Mack filed that grievance, there is evidence that from roughly that point on, Chamberlain became determined to have Mack removed from the Print Shop. Chamberlain issued him repeated counseling notifications, and ultimately a misbehavior report, issued the day after Chamberlain's warning to Mack that Mack was being given a "last opportunity" to improve his performance and remain in the Print Shop. Plaintiff also testified that at around that time in April 1999, Chamberlain said to him,

---

[7]Mack also related these events in a grievance dated April 16, 1999, in which he alleged that Chamberlain had said to him, "You guys want to start fucking writing, well I'm gonna start writing. You guys write shit and I gotta respond to the bullshit, so expect it in return." Dkt. #63 Ex. B(B).

"I want you out of my shop. I'll write a ticket if I got to. If I got to write a ticket, go to the superintendent, I am going to get your black ass out of my fucking shop." Mack Depo. Tr. at 111.[8]

Regardless of whether Chamberlain was motivated by retaliation or by his honest belief that Mack's performance was poor, the evidence certainly suggests that at some point, roughly coinciding with Mack's January 1999 grievance, Chamberlain wanted Mack out of the print shop. The notifications and misbehavior report issued by Chamberlain laid much of the groundwork for Mack's eventual removal, and, combined with plaintiff's testimony about Chamberlain's vow to "start writing shit" in response to Mack's grievance, this evidence, in my view, gives rise to a genuine issue of fact about whether Chamberlain acted out of retaliatory motives. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) (noting that "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation").

While perhaps not as strong as the evidence of retaliation, I believe that Mack's evidence of discrimination is sufficient to allow his discrimination claim to go forward as well, against Chamberlain only. There is some evidence that Chamberlain acted toward Mack based on discriminatory animus. The evidence as to the other defendants is insufficient to give rise to any genuine issue of fact, however.[9]

---

[8]Later in his testimony, Mack referred again to these statements, testifying that after one of Chamberlain's failed attempts to have Mack removed from the print shop, Chamberlain said to him, "Your daddy [*i.e.* Barrett, who had directed that Mack be allowed to remain working in the Print Shop] saved you. I don't care what I got to do. I'm going to get your fucking ass out my [sic] shop. If I have to write tickets or whatever I have to do to get you out." Mack Depo. Tr. at 145-46.

[9]My finding that plaintiff has presented enough evidence to to proceed on his claims against Chamberlain renders it unnecessary for the Court to address defendants' argument that plaintiff's claims against all the defendants other than Chamberlain should be dismissed for failure to exhaust administrative remedies. I note, however, that defendants failed to raise an exhaustion
(continued...)

More than once at his deposition, Mack testified that while he "believe[d]" that Chamberlain

had made racial remarks to him on some occasions, he could not remember exactly what Chamberlain

had said. *See* Mack Depo. Tr. at 79, 84, 88, 90. That is perhaps not surprising, since plaintiff was

deposed some five years after the events in question, but if that were plaintiff's only evidence of race

discrimination, his claim would nonetheless be subject to dismissal. When a plaintiff's deposition

testimony fails to support the allegations made in his complaint, those allegations will generally be

deemed insufficient to create a genuine issue of material fact. *See, e.g.*, *Perry v. Village of Arlington*

*Heights*, 186 F.3d 826, 828-29 (7ᵗʰ Cir. 1999) (affirming district court's decision concluding that

allegations in complaint were "were either false or without support" where plaintiff testified at his

deposition that he "could not recall" matters alleged in complaint); *Colon-Fontanez v. Municipality*

*of San Juan*, 671 F.Supp.2d 300, 332 (D.P.R. 2009) (record did not support plaintiff's claim of

adverse job action, where she alleged in complaint that she requested and was refused a change in her

work schedule from her supervisor, but at her deposition, she testified that she did not recall whether

or not her supervisor followed up on her request for a change in her work schedule); *Julceus v. City*

*of North Miami*, No. 08-23348-CIV., 2009 WL 3818430, at *8 n.4 (S.D.Fla. Nov. 13, 2009) (stating

that although plaintiff's complaint alleged that he opposed discriminatory practices by his supervisor,

---

⁹(...continued)
defense in their answer, which waives that defense. *See Presti v. Dellacamera*, No. 3:08cv427,
2010 WL 466006, at *3 (D.Conn. Feb. 4, 2010); *Harris v. Higley*, No. 05-CV-40, 2009 WL
185989, at *9-*10 (W.D.N.Y. Jan. 26, 2009).

In addition, as to defendants' argument that Mack failed to fully exhaust his grievance
concerning the loss of a bonus in January 1999, the record indicates that Mack did attempt to
appeal the denial of that grievance to the Central Office Review Committee. *See* Plaintiff's Ex. C
at 1161. Plaintiff also filed a later grievance in April 1999, which again brought up the issue
about the bonus, and there is no dispute that the April grievance was fully exhausted. *See*
Plaintiff's Ex. D.

"there is no evidence in the record to support these allegations; in fact, during Julceus's deposition he could not recall ever complaining about Gonzalez's alleged discrimination in these instances").

Mack did testify about some specific comments made by Chamberlain, however, and some of those comments do evince discriminatory animus on Chamberlain's part. For instance, Mack testified that on one occasion, as Mack was going on a "call out" to attend Muslim services, Chamberlain and Sarno started making jokes about Mack's bowtie, and said to him, "You one of those ... believers that hate white folks," and "Farrakhan don't like us white folks." Mack Depo. Tr. at 94. Although Mack did not attribute either of those statements to Chamberlain or Sarnos, he testified that when he "took offense" to those statements, Chamberlain responded by stating that he was "going to write [Mack] up" for not punching out before he began preparing for his call out.[10] When Mack stated to Chamberlain that he had never seen any inmate punch out before preparing for a call out, Chamberlain allegedly replied, "I don't care. I'm writing you up." *Id.* The juxtaposition of Chamberlain's alleged, racially-tinged comments and his issuance of a counseling notification are some evidence that the notification was racially motivated. *See Lamothe v. Bal Harbour 101 Condominium Ass'n, Inc.*, 316 Fed.Appx. 844, 846 (11th Cir. 2008) ("When statements displaying discriminatory animus are directed at an employee and made contemporaneously with an adverse employment action toward that employee, those statements constitute direct evidence of discrimination").

Chamberlain's alleged comment to Mack in April 1999 that he would do whatever it took "to get your black ass out of my fucking shop" also constitutes some evidence of discriminatory animus on Chamberlain's part. According to Mack, Chamberlain explicitly stated that if he had to "write a

_____

[10]Mack did testify that "the majority of the conversation came from Chamberlain." Mack Depo. Tr. at 95.

ticket" to get Mack out of the Print Shop, he would do so. Again, the linkage between a racial slur and an adverse action, *i.e.,* the writing of a "ticket" against Mack, in order to pave the way for his removal from the Print Shop, gives rise to an issue of fact about whether Chamberlain's repeated issuance of counseling notifications and a misbehavior report were motivated by racial animus. *See Gregory v. Daly*, 243 F.3d 687, 697 (2d Cir. 2001) ("we have long recognized that 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus' may 'give rise to an inference of discriminatory motive'") (quoting *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *cf. Lyon v. Bell Atlantic Corp.*, No. Civ. JFM-99-3631, 2001 WL 826580, at *6 (D.Md. July 19, 2001) (supervisor's comment that he was "getting tired of [plaintiff's] black ass" was "certainly probative of racial animus").

Defendants argue that it would have been illogical for Chamberlain to seek to get rid of Mack because of Mack's race, since pursuant to this Court's remedial order in the *Santiago* action, Mack would have to be replaced by another black inmate, in order to keep the percentage of black inmates in the Print Shop the same. That may be a persuasive argument before a jury, but it does not entitle Chamberlain to summary judgment. Discriminatory attitudes do not necessarily lead to objectively "logical" actions. It is also possible that Chamberlain was simply less tolerant of poor work performance by black inmates than by white inmates, and thus more likely to get fed up with a black inmate's mistakes, and to recommend his removal from the Print Shop.

As stated, however, the evidence concerning the other defendants is insufficient to give rise to any genuine issues of material fact with respect to Mack's discrimination claim. Plaintiff's claims against the other defendants are mostly based simply on their supervisory positions within the Print Shop or their physical proximity to Mack and Chamberlain at the time of some of the relevant incidents, none of which tends to show the defendants' awareness of, or personal involvement in, the

alleged violations of plaintiff's rights. That is not enough. Although Bennett denied Mack's January 1999 grievance, and Pocobello approved his removal from the Print Shop in April, there is no evidence that they knew of any discriminatory animus on Chamberlain's part. Mack's speculative allegation that the other defendants somehow had a hand in Chamberlain's alleged discrimination is not enough to give rise to a genuine issue of material fact in this regard. *See Rivera v. Fischer*, 655 F.Supp.2d 235, 237-38 (W.D.N.Y. 2009).

Likewise, I find that there is not enough evidence to allow plaintiff to go forward with his claim of religious discrimination. That Chamberlain and Sarno allegedly made derogatory comments, on a single occasion, about "Farrakhan" and "believers that hate white folks" is not enough to show that plaintiff was subjected to discrimination on account of his Muslim faith. If anything, those alleged remarks were more directed toward the subject of race than religion. *See Welch v. Chapman*, No. 07-CV-12334, 2008 WL 544618, at *5 (E.D.Mich. Feb. 27, 2008) (plaintiff's allegation that assistant deputy warden had made remark that plaintiff was "one of them so-called Muslims (Farrakhan) followers whom he ... hates" did not support a free-standing constitutional claim or a claim that the defendant deliberately discriminated against prisoner on account of his religion).

Mack's civil rights conspiracy claim is also dismissed. As stated, plaintiff's evidence, at best, shows only that he was discriminated against by a single defendant, Chamberlain. That other defendants may have been present when some of the underlying events occurred, or otherwise had some connection with plaintiffs or Chamberlain is not enough to support a finding that a conspiracy existed. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007).

The Court also rejects Chamberlain's assertion that the claims against him should be dismissed on the ground of qualified immunity. Assuming the truth of plaintiff's allegations against Chamberlain, I see no basis for a qualified-immunity defense, which requires that the defendant

believed, in good faith, that his actions did not violate the plaintiff's rights. Such a defense is incompatible with intentional discrimination, which is what is alleged here. *See Ogindo v. DeFleur*, No. 07-CV-1322, 2008 WL 5105153, at *6 (N.D.N.Y. Oct. 16, 2008) ("To the extent the Amended Complaint states valid claims against these Defendants, they are not entitled to qualified immunity because it was well-settled at all times relevant hereto that it was unlawful to intentionally discriminate against someone on account of their race or national origin").

### 4. Ponder

Ponder began working at the Print Shop in 1997, and he continued working there until he was programmed out in March 1999. Over that period, Ponder received both favorable and unfavorable reports and notifications. Many of the unfavorable reports related to the improper operation of Ponder's machine.

On April 20, 1998, Ponder was issued a counseling notification from Chamberlain stating that two bolts were missing from Ponder's machine. The notification stated that Ponder would not receive a bonus while the machine was down. Dkt. #65 Ex. B. That same day, Ponder filed a grievance about the issuance of the notification.

On April 27, 1998, Chamberlain added a paragraph to the counseling notification, stating that because Ponder had "helped out with back log of envelopes on P7 and did a good job," he would receive his bonus after all. Chamberlain added, however, that "if any more parts come up missing on machine that you are on, other disciplinary measures will be taken!" *Id.* At his deposition, Ponder testified that at around that time, Chamberlain called him into his office, and said to him, "Ponder, I'm going to give you a chance to redeem yourself for filing a grievance against me and receive your

incentive bonus ... . You still remember how to operate the fucking envelope press machine?"[11]  As a result, Ponder's grievance was either withdrawn or mooted, and he did not lose his bonus at that time.

There do not appear to have been any other significant problems until January 1999.  On January 14, Chamberlain issued a counseling notification to Ponder relating to a breakdown of Ponder's machine.  Apparently Ponder and Mack were working together that day; Mack testified that when Ponder told him that he had been given a counseling notification, Mack went to Chamberlain and told him that he, Mack, not Ponder, had been operating the machine at the time of the breakdown.  Mack Depo. Tr. at 78, 91.

The day after issuing that notification, Chamberlain recommended that Ponder be removed from the Print Shop based on his poor work performance.  Pocobello denied that recommendation.

Plaintiff filed a grievance concerning Chamberlain's counseling notification.  In his grievance, he alleged, *inter alia*, that "[w]hites are not treated this way in the print shop" and that "[b]lacks and Latinos are placed in jobs where they're punished with regular pay losses."  Dkt. #65 Ex. B(E).

The IGRC sustained Ponder's grievance in part, stating that Ponder could only lose his bonus for the pay period in which his inadequate work performance occurred, not for future pay periods.  The IGRC also "note[d] that there should be no retaliation for grievant filing the grievance."  *Id.*

On appeal, however, Superintendent Bennett denied the grievance, stating, "This is not the first instance of misuse of equipment by the grievant.  I find that the industry staff are not being

---

[11] Those are Chamberlain's words as alleged in the complaint.  At his deposition, Ponder testified that "[f]rom reading [those allegations in the complaint], it [*i.e.*, the conversation] came back" to him.  Dkt. #65 Ex. A at 103.

vindictive. I agree with the denial of the bonus ... ." The Central Office Review Committee sustained

Bennett's decision on further appeal. *Id.*

Ponder received additional inmate counseling notifications on February 24, March 5, and

March 15, 1999, all relating to improper machine operation. Following the last of those notifications,

Chamberlain recommended that Ponder be removed from the Print Shop, and that request was

approved.

In support of his discrimination claim, Ponder asserts that on April 20, 1998, Chamberlain

became belligerent toward him concerning some problem with Ponder's machine, and that

Chamberlain said to plaintiff, "I'm tired of your fucking whining. You fucking monkeys don't know

how to do shit right and y'all need to quit or get fired, whichever comes first." Complaint ¶ 19;

Ponder Depo. Tr. (Dkt. #65 Ex. A) at 50, 94. Ponder also testified that on one occasion,

Chamberlain referred to him as "Farrakhan's partner." Ponder Depo. Tr. at 50. Otherwise, Ponder's

evidence essentially consists of his assertions that the notifications issued to him and other allegedly

adverse actions and criticisms were unfounded.

As with Mack, I find that Ponder's evidence is enough to allow him to proceed on his race

discrimination claim against Chamberlain, but not against the other defendants. Chamberlain's alleged

reference to Ponder as a "monkey" is some evidence of racial animus on his part; *see, e.g.*, *Spriggs

v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001) (reversing summary judgment where

plaintiff suffered "incessant racial slurs" including "dumb monkey"); *Tawwaab v. Virginia Linen

Service, Inc.*, ___ F.Supp.2d ___, 2010 WL 3000801, at *14 (D.Md. July 28, 2010) ("courts have

repeatedly held that comparing an African-American to a monkey is a particularly severe and egregious practice").[12]

Ponder's testimony concerning some of Chamberlain's alleged statements is also corroborated by Mack's testimony. For instance, Mack testified that in April 1999, Chamberlain said to him and Ponder "that he wanted to get both us stupid motherfuckers out of the shop." Mack Depo. Tr. at 111. Ponder's testimony that Chamberlain called him "Farrakhan's partner" also echoes Mack's testimony about Chamberlain's statement that "Farrakhan don't like us white folks." The evidence suggests, in fact, that Chamberlain viewed Ponder and Mack almost as a team, and that his comments and actions were often directed at both of them.

The evidence also gives rise to issues of fact concerning Ponder's retaliation claim against Chamberlain. Chamberlain's alleged statement to Ponder that he was going to "give [Ponder] a chance to redeem [him]self for filing a grievance" certainly suggests that Chamberlain openly drew a direct link between Ponder's filing of a grievance and actual or threatened adverse actions against him. Assuming the truth of Ponder's testimony in this regard, the implicit message conveyed to him by Chamberlain was that if Ponder wanted to continue working in the Print Shop, he had better not file any more grievances.

Ponder's evidence against the other defendants, however, is no stronger than Mack's. The evidence shows only that they had some at most tangential connection with the events giving rise to Ponder's claims, and does not support a finding that they were personally involved in the alleged

---

[12]Defendants contend that some of plaintiff's claims against Chamberlain should be dismissed or limited in scope, based on Ponder's failure to exhaust his administrative remedies. Because defendants have not pleaded the affirmative defense of non-exhaustion, this defense is waived. *See* n.10, *supra*. Furthermore, defendants' arguments in this regard are based on a cramped, overly restrictive reading of plaintiff's grievances, which did generally relate to the matters that he raises in this lawsuit.

violations of Ponder's constitutional rights. Accordingly, Ponder's claims against all the defendants other than Chamberlain are dismissed.

To the extent that Ponder attempts to assert a due process claim, that claim is dismissed. Plaintiff had no protected property interest in his job at the Print Shop, *see Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009), *Gill v. Mooney*, 824 F.3d 192, 194 (2d Cir. 1987), and any due process claim arising out of the loss of a bonus fails, since New York provided plaintiff with an adequate post-deprivation remedy in the Court of Claims. *See Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001).

Ponder's conspiracy claims are dismissed for the reasons stated with respect to Mack. As with Mack's claims, I also deny Chamberlain's motion for summary judgment on the ground of qualified immunity.

## III. Plaintiffs' Motion for Class Certification

## A. Rule 23 Certification–General Standards

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). The class-action device is designed for cases in which the "issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class." *Id.* (quoting *Califano*, 442 U.S. at 701) (internal quotation marks omitted). In those cases, a class action can conserve the resources of both the court and the parties. *See id.*

In order to qualify for class certification, an action must first meet the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party

are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the interests of the class.

If that showing is made, then the party seeking class certification must show that at least one of the three conditions set forth in Rule 23(b) have been met. The first of those is that the prosecution of separate actions by individual class members would create a risk of either (1) inconsistent adjudications that "would establish incompatible standards of conduct for the party opposing the class," or (2) adjudications with respect to individual class members that would either be dispositive of the interests of other, non-party class members, or substantially impair their ability to protect their interests. Fed. R. Civ. P. 23(b)(1).

The second condition of Rule 23(b) is met when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole ... ." Fed. R. Civ. P. 23(b)(2). Certification under this subsection, then, is only appropriate if at least some of the relief sought is injunctive in nature. *See Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 163-64 (2d Cir. 2001) (discussing standards for Rule 23(b)(2) certification), *cert. denied*, 535 U.S. 951 (2002).

The third condition is met when the court concludes that (1) questions of law or fact common to the class members predominate over any questions affecting only individual members, and (2) a class action would be superior to other available methods for the fair and efficient adjudication of the controversy. Factors bearing on those findings include: class members' interests in individually controlling the prosecution of separate actions; the extent and nature of any litigation concerning the controversy that has already been commenced by members of the class; whether it would be desirable to concentrate the litigation of the claims in the particular forum; and the difficulties likely to be

encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3); *Kern v. Siemens Corp.*, 393 F.3d 120, 122 n.2 (2d Cir. 2004), *cert. denied*, 544 U.S. 1034 (2005).

In seeking certification of a class, the plaintiff bears the burden of establishing that the action satisfies these requirements.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 58 (2d Cir. 2000).  Although the Second Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation," *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 504 (S.D.N.Y. 1996) (citing *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208-09 (2d Cir. 1972)), a court may certify a class action only if it is "satisfied, after a rigorous analysis," that the rule's prerequisites have been established.  *Falcon*, 457 U.S. at 161.  This analysis will inevitably be "enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Id.* at 160 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978)).


## B. Application to these Cases

Applying these principles to the cases at bar, I conclude that class certification is not warranted.  While two of the four plaintiffs in these cases have presented enough evidence to survive summary judgment as to their claims against Chamberlain, that evidence does not suggest such widespread or systemic discrimination as would make a class action appropriate.

The proposed class here would include "all non-Caucasian inmates at ECF [Elmira] who were employed in the Print Shop from 1994 to the present, as well as all non-Caucasian inmates at ECF who were deterred from working within the Print Shop because of the discriminatory policies and/or practices set forth in this [proposed class action] complaint."  Dkt. #125-3 ¶ 20.  Plaintiffs contend that the proposed class numbers 164 current and former inmates.

The evidence presented on the claims before me indicates, at most, that two of these plaintiffs were subjected to discriminatory treatment at the hands of Chamberlain. Not coincidentally, those two plaintiffs, Mack and Ponder, worked together during some of the relevant time period, and were subjected to some of some of the same, or very similar, actions by Chamberlain at around the same times.

Based on this evidence, I am not convinced that plaintiffs have met their burden of showing that there are questions of law or fact common to the proposed class, or that the claims or defenses of the two remaining named parties are typical of the claims or defenses of the class. In addition, I do not believe that any of the conditions of Rule 23(b) have been met. At bottom, these cases present issues arising out of discrete acts of alleged discrimination and retaliation against two particular inmates. I see no reason why they cannot be fully and fairly tried as such, nor do I believe that doing so would result in any prejudice or unfairness to any of the parties or to the putative class members.

In so ruling, the Court recognizes that plaintiffs have presented expert testimony purporting to show that non-white inmates working in the Print Shop have been discriminated against with respect to their pay, promotions and length of employment. The fact remains, however, that of these four plaintiffs, two of them, Reynolds and Gould, have not presented sufficient evidence that they were discriminated against to withstand defendants' motion for summary judgment, and the other two, Mack and Ponder, have shown only that they may have been discriminated against, on particular occasions, by a single defendant. Proof that any particular inmate was discriminated against by that defendant would require individualized proof that would be "ill-suited for disposition via a class action." *See Dobson v. Hartford Financial Services Group, Inc.*, 342 Fed.Appx. 706, 709 (2d Cir. 2009). As stated, it is plaintiffs' burden to show that the criteria under Rule 23 have been satisfied, and on the record before me I do not believe that plaintiffs have presented adequate proof that their

claims are typical of those of the other putative class members, or that they share common factual or legal questions with the rest of the class. *See Boyd v. Interstate Brands Corp.*, 256 F.R.D. 340, 342-43 (E.D.N.Y. 2009).


## IV. Plaintiffs' Motion for Leave to Amend

Plaintiffs have moved for leave to file an amended, consolidated complaint. That motion is denied.

The proposed amended complaint includes all four of these plaintiffs, and adds new causes of action under New York law. In light of the Court's decision in this case, the proposed amended complaint would be subject to dismissal as to plaintiffs Reynolds and Gould. In addition, the proposed claims under New York law would be subject to dismissal. *See Ward v. LeClaire*, No. 07-CV-6145, 2008 WL 3851831, at *4-*5 (W.D.N.Y. Aug. 14, 2008); *Heyliger v. Gebler*, 496 F.Supp.2d 250, 252-53 (W.D.N.Y. 2007).

Likewise, I see no basis for a cause of action based on an alleged violation of this Court's prior order in *Santiago*. While defendant Chamberlain was not a party to that proceeding, the Second Amended Judgment entered on October 1, 1993 did state that "[t]he requirements of this Judgment shall continue in full force and effect and bind the defendants as well as their successors, agents and employees until modified or terminated by the Court ... ." *Santiago*, Dkt. #128 ¶ 30.

Assuming *arguendo* that Chamberlain was bound by the terms of that judgment, however, this proposed claim would fail because nothing that Chamberlain is alleged to have done violated that judgment. The judgment did not expressly prohibit DOCS employees or officials from discriminating against Elmira inmates on the basis of race; such a directive would have been superfluous, since such discrimination is already prohibited by the Equal Protection Clause, and made actionable by § 1983.

What that judgment did, instead, was to set forth certain rules and procedures concerning job assignments within the Elmira facility, to ensure that, consistent with security needs and other legitimate concerns, preferred jobs would be apportioned among the inmates in ratios that would roughly correspond to the racial makeup of the inmate population at Elmira. Thus, if a black inmate were removed from a preferred job, he would typically have to be replaced by another black inmate, to keep the percentage of black inmates in that particular job the same.

Although the judgment also set forth certain procedural requirements for the handling of inmate grievances alleging racial discrimination, it did not, by its terms, prohibit such discrimination. To the extent, then, that Chamberlain may have discriminated against any of the plaintiffs, he may well be answerable in damages under § 1983, for having violated the plaintiffs' constitutional rights, but he would not be in violation of the Court's remedial order and judgment entered in *Santiago*.

The proposed cause of action under 42 U.S.C. § 1981 would also be subject to dismissal, as there was no contractual relationship between plaintiffs and defendants. *See Webster v. Fischer*, 694 F.Supp.2d 163, 195 (N.D.N.Y. 2010); *Hughes v. Butt*, No. 06-CV-1462, 2009 WL 3122952, at *11 n.31 (N.D.N.Y. Sept. 28, 2009). *See also Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (inmate who held certain prison job was not an "employee" of Bureau of Prisons).[13] The proposed claims under §§ 1985 and 1986 would be subject to dismissal for the reasons stated in this Decision and Order concerning plaintiffs' claims for conspiracy and their claims based on alleged supervisory liability. Plaintiffs' motion for leave to amend is therefore denied on the ground that such amendment

---

[13]There is some authority that a lack of contractual privity between the parties will not foreclose a claim based on the "full and equal benefit" clause of § 1981. *See Hughes*, 2009 WL 3122952, at *11 n.31 (citing cases). Even if the Court were to adopt that position, however, plaintiffs' claims under § 1981 would be duplicative of their claims under § 1983. *See Busby v. City of Orlando*, 931 F.3d 764, 771 n.6 (11th Cir. 1991); *Rateau v. City of New York*, No. 06-CV-4751, 2009 WL 3148765, at *12 (E.D.N.Y. Sept. 29, 2009).

would be futile.  Plaintiffs Mack and Ponder may proceed under their current § 1983 claims against defendant Chamberlain only.


## V. Damages

Defendants contend that plaintiffs may not recover any damages for emotional injuries because there has been no showing that any of the plaintiffs sustained any physical injuries.  I agree.  Title 42 of the United States Code, § 1997e(e), provides that "[n]o federal civil action may be brought by a prisoner confined to a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  That provision bars recovery of compensatory damages in § 1983 actions, absent some physical injury to the plaintiff.  *See Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002); *Abney v. Jopp*, 655 F.Supp.2d 231, 233 (W.D.N.Y. 2009); *Brown v. Napoli*, 687 F.Supp.2d 295, 299 (W.D.N.Y. 2009).  There is no allegation, much less evidence, here that plaintiffs sustained any physical injury as a result of the events giving rise to their claims.


## VI. Consolidation for Trial

These cases have previously been consolidated for purposes of discovery.  Plaintiffs also seek to consolidate them for trial.

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the action ... ."  "The trial court has broad discretion to determine whether consolidation is appropriate" under this rule.  *Malcolm v. National Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993).

I believe that consolidation is warranted as to the two remaining actions here. As noted earlier, many of the facts involving plaintiffs Mack and Ponder involve the same incidents, and it makes eminent sense to try them together. A joint trial of their claims would not prejudice any party here, would be more convenient for the parties, and would serve the interest of judicial economy.

## CONCLUSION

In *Reynolds v. Barrett*, 99-CV-6228, defendants' motion for summary judgment (Dkt. #118) is granted, and the complaint is dismissed. Plaintiff's motion for class certification (Dkt. #123) is denied. Plaintiff's motion to amend/correct the complaint (Dkt. #99) is denied as moot.

In *Gould v. Chamberlin*, 99-CV-6503, defendants' motion for summary judgment (Dkt. #69) is granted, and the complaint is dismissed. Plaintiff's motion for class certification (Dkt. #74) is denied.

In *Mack v. Barrett*, 00-CV-6436, defendants' motion for summary judgment (Dkt. #59) is denied. Plaintiff's motion for class certification (Dkt. #65) is denied.

In *Ponder v. Chamberlin*, 00-CV-6440, defendants' motion for summary judgment (Dkt. #62)) is denied. Plaintiff's motion for class certification (Dkt. #67) is denied.

*Mack v. Barrett* and *Ponder v. Chamberlin* are consolidated for trial pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      October 4, 2010.